OPINION.
{¶ 1} Defendant-Appellant Luther T. McCormick is appealing the judgment of the Montgomery County Court of Common Pleas convicting him of felonious assault and tampering with evidence and sentencing him accordingly.
 {¶ 2} On November 20, 2001, McCormick was indicted by the Montgomery County Grand Jury on one count of felonious assault, in violation of R.C. 2903.11(A)(2), with a three-year firearm specification, and one count of tampering with evidence, in violation of R.C. 2921.12(A)(1). McCormick filed a motion to suppress on December 12, 2001, pursuing suppression of items found in his vehicle and his apartment, along with statements he had made to police after his arrest. The motion was heard on February 8, 2002, and the trial court issued its decision on March 29, 2002, overruling the motion in part and sustaining it in part.
 {¶ 3} The jury trial commenced on July 8, 2002. The jury found McCormick guilty as charged on July 17, 2002. On August 13, 2002, the trial court sentenced McCormick to seven years incarceration for the felonious assault offense, with the three-year firearm specification imposed consecutively; McCormick was also sentenced to a concurrent one-year term of incarceration for the tampering with evidence charge. McCormick's total term consisted of ten years.
 {¶ 4} At trial, the following evidence was adduced:
 {¶ 5} Miamisburg police officers were dispatched to a shooting at McCormick's residence at 989 Somerset Drive on July 24, 2001, at approximately 2:12 a.m. Upon arriving at the scene, Miamisburg police officer Joseph Flores found McCormick's wife of three years, Tara McCormick, outside Apartment 3. She was naked, bent over, covered in blood, and was bleeding extensively. She was grabbing at her throat and pulling white tissue fragments from her mouth to enable her to breath.
 {¶ 6} Noticing a trail of blood leading from Apartment 2 to Tara, and noticing that the door to Apartment 2 was ajar, Officers Flores, Sherrill, and Kokenge entered the apartment to search for the perpetrator or other victims. They found no one present, but discovered a spent .40 caliber bullet shell casing on the dining room table. The officers returned outside to tend to Tara.
 {¶ 7} Officer Sherrill, concerned that Tara would go into shock because of the trauma, asked Officers Flores and Childress to re-enter the apartment and retrieve a blanket he had seen on the couch. As Officer Childress did so, a spent bullet rolled from the blanket to the floor.
 {¶ 8} The officers wrapped Tara in the blanket and attempted to ask her some questions. They asked her if she or someone else shot her, and she indicated "no" by shaking her head.
 {¶ 9} Miamisburg paramedics arrived and saw that Tara had a lump on the side of her neck which appeared to be a puncture wound, and she was losing a great deal of blood from her mouth. It was determined to rush her to the hospital for treatment instead of treating her at the scene.
 {¶ 10} During his investigation of the crime scene, Officer Flores walked around the outside of the apartment in an effort to search for suspects and to see the condition of the rear door. Officer Flores found the back door to Apartment 2 closed, but he noticed fresh "scratches and pry marks to the lockset, the knob and the door jam." Laying on the stoop just outside the rear door was a small balloon, about the size of a quarter, which, based upon Officer Flores' experience, was commonly used to package narcotics. Based upon these observations, Officer Flores increased the perimeter of the crime scene by securing the rear of the apartment.
 {¶ 11} That evening, McCormick was supposed to be at the Ohio State Patrol Academy in Columbus, Ohio. Instead, McCormick appeared at the Xenia post of the State Highway Patrol at approximately 3:00 a.m. McCormick, who at that time was stationed at the Hamilton Investigative Unit, had been stationed at the Xenia post in the past. Dispatcher Susan Hamilton and Trooper Bryan Butler were at the Xenia post when he arrived. McCormick told Hamilton that he had not been feeling well, and he immediately went into the rest room. When he came back, McCormick stated to Hamilton that he had received a partial page bearing the first two digits from his home phone number; he explained to Hamilton that he was afraid something might have happened to his son who lived in Xenia, not far from the post. McCormick, who was acting anxious and upset, stated that he had driven from the Academy in Columbus to the post, stopping several times along the way to vomit because he was so concerned.
 {¶ 12} Trooper Butler entered the room and asked McCormick how he was doing. McCormick expressed his concern for his son, reiterating the story he had just told Hamilton. Hamilton informed McCormick that the Dayton post had called to see if he was there; McCormick asked Hamilton to call the Dayton post to see if they had any information about his son. The individual with whom Hamilton spoke stated that McCormick's son was fine. The information was relayed to McCormick, who then inquired about his wife. At one point, McCormick asked Trooper Butler to drive him to Miamisburg so he could check on his wife. The Dayton post advised Trooper Butler to keep McCormick at the Xenia post until further notice. Trooper Butler was not told why McCormick needed to be kept there, but the person instructed Trooper Butler to take his car keys to prevent him from leaving if it were necessary.
 {¶ 13} Trooper Anna Williams was called in to help so that Trooper Butler could remain with McCormick. Trooper Butler met Trooper Williams in the parking lot of the Xenia post. Trooper Butler asked her to examine McCormick's unmarked, state-issued vehicle for McCormick's service revolver, but to not disturb any weapons she might find. She found McCormick's weapon in his trunk, along with several rounds of ammunition, all of which she left undisturbed.
 {¶ 14} Shortly after Trooper Williams entered the post, Captain Kolcum called and instructed the troopers to handcuff McCormick before the Miamisburg Police Department arrived. As they cuffed him, McCormick acted very confused and kept asking the troopers what was wrong with his wife.
 {¶ 15} Shortly thereafter, at approximately 4:15 a.m., Miamisburg Police Detective Rod Stanley and Sergeant Jim Royse arrived at the Xenia post. They led McCormick into the reports room for privacy and shut the door. Det. Stanley informed McCormick that they were there to talk about the "incident" that occurred at his home. McCormick waived his Miranda rights and asked what was wrong with his wife. Det. Stanley stated "Your wife's been shot," to which McCormick did not react at all. Det. Stanley asked McCormick "did you shoot your wife?" McCormick replied "no." When asked if he had any ideas why this had occurred, McCormick stated that someone might have been trying to "send him a message" because he was a law enforcement officer. McCormick continued denying his involvement even after Det. Stanley explained that his weapons would be tested to see if they had fired the bullet, and McCormick replied that he was confident there would be no match.
 {¶ 16} McCormick explained to Det. Stanley how he had received a partial page from his home phone number, and had become concerned when he tried to call home and Tara had not answered the phone. He stated that he lived in a "bad apartment complex" and that he had observed a neighbor fall to the ground and convulse after inhaling some kind of narcotic from a balloon. McCormick stated that he had driven from the Academy in Columbus to the Xenia post concerned about his wife. He told Det. Stanley that on his way home, he had become so "worked up" that he had to pull over onto the side of the road to vomit. He also stated that he had attempted to call several times from pay phones along the way to communicate with Tara. Det. Stanley testified that he had intentionally leaned close to McCormick to detect any odor of vomit or alcohol on his breath, but could detect none.
 {¶ 17} Det. Stanley and Sgt. Royse went over McCormick's statement with him several times, explaining how it did not make sense. They noticed McCormick's demeanor change, and McCormick became "uncomfortable." At approximately 6:15 a.m., McCormick dropped his head into his hands and began to sob. He then admitted to shooting Tara.
 {¶ 18} McCormick stated that he had been at the Academy attending training, and that Tara had just recently been in Harrisburg, Pennsylvania, visiting her ill mother. McCormick had left the Academy in Columbus just before the gates were locked at 11 p.m., and he drove to his apartment in Miamisburg to "surprise" Tara. He unlocked the door, walked into the apartment, and noticed Tara asleep on the living room couch. He explained to Det. Stanley that Tara was a very heavy sleeper, stating that "nothing wakes her up." McCormick walked past the living room into the dining room, and removed his service weapon from the holster in the waistband of his sweat pants. He began unloading the weapon as he was standing in the dining room facing the living room. He removed the magazine and placed it on the counter. McCormick "thought he had jacked the slide back to remove the round but suddenly it went off." When the gun discharged, he panicked and ran out the back door. He entered his car and drove aimlessly, eventually finding himself headed to the Xenia post. As he reached the intersection of I-75 and I-675, he began cleaning the gun with a white cloth he had in the car. When he was done cleaning the weapon, he rolled down his passenger's side window and threw out the cloth. At the Xenia post, he opened the trunk and took another live round from a different magazine and placed it in the gun, to remove any indications that the gun had been fired.
 {¶ 19} McCormick admitted that he had not attempted to help Tara; instead, he had panicked and fled the apartment. He also stated that at the time he left the apartment, he had been uncertain if she had been hit. However, prior to leaving the apartment, he grabbed the magazine and reloaded it into his weapon.
 {¶ 20} McCormick agreed to write down his statement, although he asked to go elsewhere to do it so as to not run into other troopers he knew. The officers agreed, and they transported McCormick to Miamisburg. On the way, they attempted to retrieve the cloth McCormick used to wipe down powder from the gun. They were unable to locate the cloth.
 {¶ 21} At the Miamisburg Police Department, the officers brought McCormick into an interview room and left him alone to compose his statement. The statement was fairly consistent with the verbal statement he gave the Miamisburg officers at the Xenia post. However, Det. Stanley prodded McCormick, telling him, "I'm sure there's more that you can add to this." McCormick revised his story and admitted that he had realized he had shot Tara prior to leaving his apartment, because he had heard her moan and had watched her roll on her side after the shot was fired. Det. Stanley asked why he left without getting Tara some help, and he again stated that he had panicked, referring to himself as a "coward."
 {¶ 22} Det. Stanley requested that McCormick write out another statement, and McCormick wrote out a second two-page statement. Upon more questioning by Det. Stanley, McCormick stated that he had removed the magazine from his P-239 compact .40 caliber handgun, and placed it on the counter next to him. He believed he had brought the slide back to eject the live round, and he proceeded to squeeze the trigger to drop the hammer forward when the gun went off. Det. Stanley, who was familiar with this type of handgun, testified that the weapon McCormick used to shoot Tara was a double-action handgun, and the hammer would not automatically stay back on such type of gun, thus he did not believe that McCormick was being truthful.
 {¶ 23} The officers terminated the interview process and took McCormick to the county jail. As he was being booked into the jail, Det. Stanley noticed that McCormick was wearing only one sock. McCormick explained the missing sock by stating that he had been in such a hurry to leave the Academy.
 {¶ 24} The State produced evidence that the bullet used to hit Tara was different from the bullets issued to McCormick by the State. The bullets recovered from McCormick's house and his state-issued vehicle were the standard state-issued silver-colored Speer bullets. The bullet McCormick used to shoot Tara was a yellow-brass Winchester bullet. Chris Monturo, a firearm and toolmark examiner from the Miami Valley Regional Crime Laboratory, testified that the Winchester bullet had scratch marks etched into the casing that were not caused by the firing of the gun nor left by the manufacturer. He opined that the marks were carved into the casing before firing the bullet. Monturo also concluded that the gun could not have "accidentally" fired the way that McCormick had described, due to a safety mechanism installed in the gun.
 {¶ 25} One theory of the prosecution was that McCormick made the abnormal scratch marks on the bullet casing to prevent it from being traced to McCormick's gun. To support this theory, Trooper Mark Herren testified that he had had a conversation with McCormick on June 1, 2001, regarding how the Bureau of Criminal Investigations links a spent round to the gun from which it was shot.
 {¶ 26} Another theory of the State was that McCormick planted the marijuana-filled balloon on his back porch to make it seem as though an intruder broke in and shot Tara. The State produced evidence that McCormick, during his course of duties as a state trooper, had been involved in an investigation of Genial Peebles, who had been arrested for smuggling narcotics into the Warren Correctional Institution. She packaged the drugs in small white balloons, similar to those found outside McCormick's back door. Seven balloons contained marijuana, and one contained cocaine. McCormick had custody of the eight balloons. He allegedly logged them into evidence and mailed them to the crime lab for testing, however the lab never received the drugs and Peebles' case had to be dismissed.
 {¶ 27} McCormick's defense was that the shooting was accidental. Tara testified that on July 23, 2001, she came home from work, removed all of her clothing and ate dinner on her living room couch. She fell asleep on the couch and was awakened by the back door slamming. She felt something in her throat and began coughing, and when she sat up she saw blood coming from her mouth. She panicked and tried to dial 9-1-1, but got tangled up by the phone cord and accidentally jerked the phone cord from the wall. She ran and knocked on two neighbors' doors simultaneously; one resident told her that help was on the way.
 {¶ 28} When the police officers arrived, they asked her what was wrong and she stated that she was "choking." She began "clearing her airways" to unblock her airways by removing an obstruction from the back of her mouth or throat. When the officers began talking about whether she had been shot, Tara indicated that she had not been shot, because at that point she was unaware that her injuries resulted from being shot. The bullet entered her left side lip area, and exited her right neck region. Tara suffered extensive injuries which involved reconstruction of her jaw, mouth and teeth.
 {¶ 29} McCormick was found guilty of all offenses as charged. He was sentenced on August 13, 2002 to seven years for the felonious assault conviction, with the three-year firearm specification to run prior to and consecutive with the principal sentence. He also received a concurrent one-year term for the tampering with evidence charge, for a total of ten years.
 {¶ 30} McCormick now appeals his convictions and sentences, asserting four assignments of error.
 McCormick's first assignment of error: {¶ 31} "The trial court committed prejudicial error and denied Appellant a fair trial as guaranteed by the federal and state constitutions, when it refused to instruct the jury on the lesser-included offense of negligent assault."
 {¶ 32} In this assignment of error, McCormick asserts that the trial court committed reversible error when it decided that he could not rely on the defense of accident and also have the jury instructed on the lesser-included offense of negligent assault. According to McCormick, he should have not been made to choose between accident and negligent assault, instead he should have been allowed to rely on both propositions. Furthermore, McCormick disagrees with the rationale in existing caselaw making it impossible for the jury to receive both instructions and asserts that it should be overruled.
 {¶ 33} The State argues that McCormick did not ask for a negligence instruction, therefore the error must be analyzed under the plain error standard. The State contends that it could not be said that but for the error, McCormick would not have been convicted.
 {¶ 34} In his reply brief, McCormick asserts that it was "obvious" that he wanted both instructions, however the trial court forced him to choose which one to give to the jury. McCormick concedes that while he had not "formally `objected' to the instruction, the record does clearly show that appellant wanted the negligence instruction as well as the accident instruction."
 {¶ 35} After a careful review of the record, we find that the State's interpretation of the events was accurate. We refer to the in camera hearing found in the transcript on pages 1170 through 1187. At the beginning of the hearing, the following exchange occurred:
 {¶ 36} "THE COURT: * * * Court had a charge conference last Friday with counsel and this morning the Court delivered to counsel the Court's anticipated jury instructions. And Mr. Franceschelli wanted to cover a couple matters regarding the instructions, so, Mr. Franceschelli.
 {¶ 37} "MR. FRANCESCHELLI: Thank you, your Honor.
 {¶ 38} "With your permission, I'd like to address the issue of a potential instruction on accident and the state would oppose it." (Tr. 1170.)
 {¶ 39} The State cited several cases that found error in a trial court's decision to instruct on accident when there was clear evidence of negligence. The State asserted that since McCormick's version involved the negligent disarmament of his firearm, he should not be entitled to an accident instruction.
 {¶ 40} Mr. Rion, on McCormick's behalf, attempted to distinguish this situation from the facts in the cases upon which the State relied:
 {¶ 41} "* * * it looks like the focus of that case where the court was going related to he wanted a dual instruction, one for self defense and one for accident.
 {¶ 42} "And it seemed like the Court said, well, since the jury found that it was not self-defense but yet it was intentional that there had been a crime committed; so, therefore cannot argue accident where it's clear that there had been a crime committed. In this case, the argument is not self defense, it's not aggravated assault; it's not heat of passion; it's there was no crime committed. It was a complete accident and I think that's been our theory all along.
 {¶ 43} "THE COURT: Now, where, cite me to where in the evidence there is evidence that this was not simply a negligent handling of the firearm but it was a pure accident.
 {¶ 44} "MR. RION: Well, an accident result is one that occurs unintentionally so I think clearly his argument and his statement was that he didn't mean to do this. He went home to surprise his wife and really be with her in a very loving way and not in any way causing physical harm and without any design or purpose to bring it about.
 {¶ 45} "Clearly in his statement he went home to be with her amicably, not confrontationally. And it's a mere physical happening or events out of the usual order of things not reasonably foreseen as a natural and probable result of a lawful act. From his point of view, he was unloading his gun and this wouldn't have been foreseen that in doing that he would shoot his wife. And I think there's clearly facts present to support an accident in this case. That's been our position all along. Tara certainly has testified that it was an accident." (Tr. 1173-1175.)
 {¶ 46} Shortly thereafter, Mr. Rion stated, "There is no evidence of any motive in this case that would show that it was anything other than an accident. So, with that, I'd argue that all the facts from our perspective would lead to that. And I think if we're specifically asking for an instruction, we'd like to argue that." (Tr. 1175.)
 {¶ 47} During the remainder of the hearing, the State continued to argue negligence; Mr. Rion continued to press for accident. At the conclusion of the hearing, the trial court ruled against the State and found that McCormick was entitled to an instruction on the definition of accident.
 {¶ 48} Based upon what we have found in the record, we do not find that McCormick advocated for an instruction on negligence. Furthermore, McCormick did not object to the trial court's jury instructions. Because of this, we will review this argument under a plain error analysis. Crim.R. 30(A). State v. Wickline (1990), 50 Ohio St.3d 114, 552 N.E.2d 913. Plain error does not exist unless it can be said that but for the error, the outcome of the trial clearly would have been different. State v.Long (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. State v.Sapp, Clark App. No. 99 CA 84, 2002-Ohio-6863.
 {¶ 49} In this case, we must determine whether the instructions for negligent assault would have been proper and, if so, whether its omission rises to the level of plain error.
 {¶ 50} The offense of felonious assault under R.C. 2903.11(A)(2) provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon[.]" The offense of negligent assault under R.C. 2903.14(A) provides that "[n]o person shall negligently, by means of a deadly weapon * * * cause physical harm to another[.]"
 {¶ 51} Negligent assault has been found to be a lesser included offense of felonious assault, however an instruction on a lesser included offense need not always be given. State v. McCornell (1993),91 Ohio App.3d 141, 147, 631 N.E.2d 1110. "Even though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." State v.Thomas (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. Conversely, if a jury could not reasonably find against the state on any element of the crime, then a charge on a lesser included offense is not only not required but is also improper. Id. Moreover, the evidence must be construed in a light most favorable to the defendant.State v. Wilkins (1980), 64 Ohio St.2d 382, 388, 415 N.E.2d 303, 18 O.O.3d 528.
 {¶ 52} In this case, the record does contain evidence upon which a reasonable jury could determine that McCormick acted knowingly, i.e., that he was aware that his conduct would probably cause a certain result or would probably be of a certain nature. While McCormick argues that the jury could have convicted him of the offense of negligent assault, based upon his shooting of Tara while trying to unload and clean his gun, the mere possibility that the jury might have reached a different conclusion is not sufficient to sustain the plain error standard. The record simply does not support the proposition that, given the opportunity to convict McCormick of negligent assault, the jury would have done so in preference to finding him guilty of felonious assault. McCormick claimed that he accidentally shot Tara in the head while clearing his gun in the living room as she slept on the couch. However, there was evidence that McCormick, who was supposed to be staying the night at the Ohio State Troopers Academy, snuck out from the academy just before the gates were locked and drove home.
 {¶ 53} The crime scene was altered to make it look as though a suspect in one of McCormick's drug cases was seeking revenge. There was a marijuana-filled balloon found outside the back door of McCormick's apartment, closely resembling narcotics evidence found in the Peebles case which McCormick previously had in his possession. The rear apartment door had fresh scratches and pry marks on the lockset, the knob and the door jamb, as if an intruder had attempted to force entry into the apartment. Later, when asked what could be wrong with Tara, McCormick told the officers that someone had been trying to "send him a message" because of his work as a trooper.
 {¶ 54} Additionally, McCormick shot Tara with a bullet unlike those issued by the State and different from every bullet he possessed. Prior to shooting Tara, McCormick had a conversation with another trooper about how the crime lab can trace a spent bullet to a specific weapon. The bullet used to shoot Tara had been tampered, with grooves cut into the base of the bullet to mask from which weapon it had been fired. After he shot Tara, McCormick "panicked" and fled the apartment, but not before retrieving the magazine he had just removed from his gun. McCormick failed to call 911 for assistance, and he did not inform anyone of Tara's condition for several hours, demonstrating that McCormick had intended to cause Tara serious physical harm. He wiped off his gun to remove fingerprints and other traces of gun powder, threw away the cloth used to clean the gun, and placed another bullet into the gun to disguise the fact that the gun had been fired.
 {¶ 55} Furthermore, McCormick was not truthful with the officers. He created several different stories and did not tell the officers what had happened until several hours after arriving at the Xenia post. McCormick's last statement was that while clearing the gun, he believed he had brought the slide back to eject the live round. He proceeded to squeeze the trigger to drop the hammer forward, and the gun went off unintentionally. However, Chris Monturo from the Miami Valley Regional Crime Lab concluded that the gun could not have "accidentally" fired the way that McCormick described due to a safety mechanism installed in the double-action gun.
 {¶ 56} Based upon these events, and the severity of Tara's injuries, we find that no reasonable jury could have concluded that McCormick intended to cause Tara anything but serious physical harm, and that it was not the result of negligence. For this reason, we need not address McCormick's claim that existing caselaw should be overruled due to potential error in the rationale that a jury may not be instructed on accident and negligence.
 {¶ 57} We therefore find that the trial court's failure to instruct the jury on the lesser-included offense of negligent assault did not constitute plain error. McCormick's first assignment of error is therefore overruled.
 McCormick's second assignment of error: {¶ 58} "The trial court committed prejudicial error and denied Appellant a fair trial when it failed to give the jury a limiting instruction with respect to how the jury should consider the evidence of the marijuana-filled balloon."
 {¶ 59} McCormick claims that the trial court committed reversible error when it failed to issue the instruction to the jury that they were to consider the evidence of the Genial Peebles case solely to determine whether McCormick had been in possession of the marijuana-filled balloon. McCormick asserts that the evidence of these "other acts" cast him in a negative light as "a person who violated the very laws he was assigned to uphold."
 {¶ 60} We note that despite the trial court's error in failing to issue a limiting instruction, McCormick failed to object. Following its recitation of the jury instructions, the trial court held a sidebar on the record whereby Mr. Rion was specifically asked if he had any objections to the jury instructions as they stood. He stated that he did not. Accordingly, we must review this assignment of error under the plain error standard.
 {¶ 61} Under Evidence. R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Other acts evidence is allowed in a criminal proceeding if "(1) substantial proof is adduced to show that the person against whom the evidence is offered committed the other act, (2) one of the matters enumerated in the rule or the statute is a material issue at trial, and (3) the evidence tends to prove the material enumerated matter." Statev. Penland (1998), 132 Ohio App.3d 176, 189, 724 N.E.2d 841.
 {¶ 62} The evidence at issue was admitted not to show that he acted in conformity with and "outside the law" as he did in the Peebles case, but in order for the State to prove intent and plan to assault Tara and to disprove that there was an element of negligence or accident. Such evidence is admissible under Evid.R. 404(B).
 {¶ 63} Moreover, McCormick has failed to demonstrate how he was prejudiced by the trial court's failure. While such failure on the trial court was error, it did not rise to the level of plain error. As we stated in the previous assignment of error, the State's evidence greatly supports McCormick's conviction for felonious assault, and we cannot find that but for the trial court's failure to issue the limiting instruction, McCormick would not have been convicted.
 {¶ 64} McCormick's second assignment of error is overruled.
 McCormick's third assignment of error: {¶ 65} "The trial court committed prejudicial error in admitting Appellant's confession to wiping down the gun, because the corpus delicti of the offense had not been established before the statement was admitted."
 {¶ 66} McCormick argues that the trial court violated the corpus delicti rule by allowing the State to admit McCormick's admission that he wiped down the gun prior to presenting evidence of the tampering with evidence charge.
 {¶ 67} As we recently stated in State v. Jennings, Clark App. No. 2000 CA 78, 2003-Ohio-4429, "the corpus delicti of a crime consists of the act and the criminal agency of the act and must be established by evidence outside of a confession before the confession is admissible. SeeState v. Maranda (1916), 94 Ohio St. 364, 114 N.E. 1038, paragraphs one and two of the syllabus; see, also, State v. Van Hook (1988),39 Ohio St.3d 256, 261, 530 N.E.2d 883. `The quantum or weight of such outside or extraneous evidence is not of itself to be equal to proof beyond a reasonable doubt, nor even enough to make it a prima facie case.' Maranda, supra, at paragraph two of the syllabus. Rather, `[i]t is sufficient if there is some evidence outside of the confession that tends to prove some material element of the crime charged.' Id. The rule `does not require evidence upon all elements of the crime but only `some material element.' Van Hook, supra, at 262, 530 N.E.2d 883, quotingMaranda, supra, at paragraph two of the syllabus. The corpus delicti rule is designed to protect `persons who confess to crimes that they not only did not commit themselves, but which were never committed by anyone.'State v. Nobles (1995), 106 Ohio App.3d 246, 261-62, 665 N.E.2d 1137. However, the rule need not be applied `with a dogmatic vengeance.' Statev. Edwards (1976), 49 Ohio St.2d 31, 36, 358 N.E.2d 1051."
 {¶ 68} In this case, McCormick was convicted of tampering with evidence as a result of his wiping down his gun. Tampering with evidence under R.C. 2921.12 provides:
 {¶ 69} "(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
 {¶ 70} "(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]"
 {¶ 71} Before McCormick's confession could be admitted as proof that he did commit the offense of tampering with evidence, there had to be some evidence outside his confession tending to prove a material element of that crime. Contrary to McCormick's argument, we find that the State produced some evidence of an element of the tampering charge prior to presenting McCormick's confession, and thus the corpus delicti rule was not violated. Specifically, the State produced evidence that McCormick was wearing only one sock the night of the incident, making the inference that McCormick likely removed the sock to wipe off the gun, and then disposed of the sock before arriving at the Xenia post. McCormick explained to the officers that he was in a hurry to leave the academy and that is why he was wearing only one sock. There was testimony that Det. Stanley searched McCormick's room for the missing sock, but none was found.
 {¶ 72} Although minimal, we believe this evidence does constitute sufficient evidence of the corpus delicti of the crime of tampering with evidence, and thus we find that the trial court properly admitted McCormick's confession.
 {¶ 73} McCormick's third assignment of error is overruled.
 McCormick's fourth assignment of error: {¶ 74} "The trial court erred when it failed to suppress certain items of evidence, and thus violated the Fourth Amendment guarantee against unreasonable search and seizures."
 {¶ 75} Preliminarily, we note that when a trial court considers a motion to suppress, it serves as the trier of fact and is the primary judge of the weight of the evidence and the credibility of witnesses.State v. Fanning (1982), 1 Ohio St.3d 19, 20, 437 N.E.2d 583. When reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's findings if they are supported by competent, credible evidence. State v. McNamara (1977),124 Ohio App.3d 706, 710, 707 N.E.2d 539. The appellate court must also rely upon the trial court's ability to assess the credibility of the witnesses. State v. Anderson (1995), 100 Ohio App.3d 688, 691,654 N.E.2d 1034.
 {¶ 76} Although McCormick does not challenge the initial entry into the apartment to search for possible suspects or other victims, he does assert that the police officers' discovery of a bullet after they reentered the apartment to remove a blanket from a couch should be suppressed, as the "exigency" of the situation had passed. Additionally, McCormick contends that the bullet should have been suppressed because it was not in plain view, but the bullet had become apparent only after the officers "moved something in order to see it."
 {¶ 77} The trial court in this instance found that exigent circumstances warranted the police officers' reentry into apartment. Tara was discovered by the police in front of Apartment 3 completely naked, bloody, and gasping for air. Concerned that she might go into shock, Sgt. Childress reentered the apartment to retrieve a blanket for Tara. The trial court found that reentry was warranted for the limited purpose of retrieving a blanket for Tara, from which the spent bullet fragment fell to the couch where it was observed by Sgt. Childress. Hence, the bullet was admissible under the "plain view doctrine." We agree.
 {¶ 78} Under the Fourth Amendment, a warrantless entry and search of a private residence is presumptively unreasonable. Payton v. New York
(1980), 445 U.S. 573, 100 S.Ct. 1371; Welch v. Wisconsin (1984),466 U.S. 740, 104 S.Ct. 2091. Invasion of the sanctity of the home is the chief evil against which the Fourth Amendment's warrant requirement is directed. United States v. United States District Court (1972),407 U.S. 297, 92 S.Ct. 2125. The government must overcome the presumption that warrantless searches of homes are per se unreasonable by demonstrating that the search falls within one of the few, well-recognized exceptions to the warrant requirement. Welsh v.Wisconsin, supra; State v. Kessler (1978), 53 Ohio St.2d 204,373 N.E.2d 1252.
 {¶ 79} The United States Supreme Court has defined one such exception in holding that a warrantless police entry into a private residence is not unlawful if made upon exigent circumstances. Katz v.United States (1967), 389 U.S. 347, 357, 88 S.Ct. 507. The need to protect or preserve human life or avoid serious injury is justification for what would otherwise be an illegal entry absent exigent circumstances. Mincey v. Arizona (1978), 437 U.S. 385, 392-393,98 S.Ct. 2408. Police officers are not forced to delay an investigation if to do so would endanger the lives of others. Warden, Maryland Penitentiary v.Hayden (1967), 387 U.S. 294, 298-299, 87 S.Ct. 1642. Officers must have a reasonable basis for the belief that entry into a structure is necessary to protect or preserve life, or to avoid serious injury. Mincey, supra, at 392-393. The entry and search must be limited in scope and duration to the purpose justifying the intrusion, including only that which is necessary to alleviate the emergency and the dangers associated with it. Id. Furthermore, officers may seize "any evidence that is in plain view during the course of their legitimate emergency activities." Mincey, supra, at 392-393, citing Michigan v. Tyler, 436 U.S. 499, 509-510.,98 S.Ct. 1942; Coolidge v. New Hampshire (1971), 403 U.S. 443 at 465-466,91 S.Ct. 2022.
 {¶ 80} The facts presented in this case demonstrate that the police officers were under a legitimate and reasonable belief that Tara was in need of emergency assistance that required reentering the apartment. The officers were dispatched to McCormick's apartment where upon their arrival they found Tara sitting naked in front of the apartment, her upper torso bloody. She was gasping for breath, clawing at her mouth, and pulling tissue fragments from her throat. Fearing that Tara would go into shock, Sgt. Childress reentered the apartment for the limited purpose of gathering a blanket that he had spotted on the couch. Upon removing the blanket from the couch, the spent bullet fragment fell to the ground.
 {¶ 81} We agree with the trial court that this search had been justified by an emergency threatening Tara's life, and that the bullet fragment was discovered within the limited purpose and scope of the legitimate reentry into the apartment.
 {¶ 82} Additionally, McCormick argues that the gun found in the trunk of his state-issued vehicle should be suppressed. He contends that he had a legitimate expectation of privacy in the vehicle, and it was searched without a warrant and without consent.
 {¶ 83} The trial court in this instance found that McCormick did not have a legitimate expectation of privacy in his state-issued vehicle, as it was owned by the State of Ohio and issued to McCormick "only in conjunction with his trooper duties" and was subject to quarterly and "spot" inspections which did not require McCormick's consent. We agree.
 {¶ 84} The Fourth Amendment governs searches and seizures by government employers or supervisors. Brannen, et. al. v. Board ofEducation, Kings Local School District (2001), 144 Ohio App.3d 620, 629,761 N.E.2d 84, citing O'Connor v. Ortega (1987), 480 U.S. 709, 715,107 S.Ct. 1492, 1496. The Fourth Amendment is implicated when "the conduct of government employers or supervisors infringes upon an expectation of privacy in the workplace that society is prepared to consider reasonable."Brannen, supra, at 629, citing O'Connor, supra, at 715. The "workplace" has been defined as "those areas and items that are related to work and are generally within the employer's control." Brannen, supra. Furthermore, an employee's expectation of privacy in the workplace must be assessed on a case-by-case basis. Id., citing O'Connor, supra, at 717-718.
 {¶ 85} As the trial court noted, in this case, Lt. Kelly Hale, McCormick's supervisor, testified that McCormick was issued an unmarked vehicle in his capacity as a state trooper. The vehicle, owned by the State of Ohio, was subject to quarterly and "spot" inspections and had strict rules regarding its usage in conjunction with McCormick's trooper-duties. Accordingly, we agree with the trial court that McCormick did not have a reasonable expectation of privacy in the vehicle. McCormick's lack of a reasonable expectation of privacy in the State-issued vehicle defeats his claim that his Fourth Amendment rights were violated.
 {¶ 86} Finally, McCormick disputes the admission of his post-arrest statements, as he claims he was arrested without probable cause. In particular, McCormick argues that the evidence fails to articulate why McCormick was a suspect in Tara's shooting.
 {¶ 87} A warrantless arrest is constitutional if it is supported by probable cause. State v. Jones (1996), 112 Ohio App.3d 206,678 N.E.2d 285. Whether probable cause exists is determined from the totality of the facts and circumstances. State v. Hill (October 26, 2001), Montgomery App. No. 18569, 2001-Ohio-1649. The question is whether, at the moment the arrest was made, the facts and circumstances within the arresting officer's knowledge, or of which the officer had reasonably trustworthy information, were sufficient to warrant a prudent person in believing that the suspect had committed or was committing a criminal offense. Jones, supra; Beck v. Ohio (1964), 379 U.S. 89,85 S.Ct. 223. Furthermore, as the Ohio Supreme Court stated in State v.Henderson (1990), 51 Ohio St.3d 54, 57, 554 N.E.2d 104, "[s]o long as `the law enforcement system as a whole has complied with the Fourth Amendment' and possesses facts adding up to probable cause, the arrest will be valid even though the arresting officer alone does not possess these facts.'" Id., citing 1 LaFave Israel, Criminal Procedure (1984) 208, Section 3.3(e) and Whiteley v. Warden (1971), 401 U.S. 560,568-569, 91 S.Ct. 1031.
 {¶ 88} We find sufficient probable cause to arrest McCormick existed at the time that McCormick was placed under arrest. Trooper Butler was provided with information from the Dayton post and the Miamisburg Police Department that McCormick's wife had recently been shot in the face inside the apartment which McCormick and she shared. McCormick, who was supposed to be at the Ohio State Patrol Academy in Columbus, appeared unannounced at the Xenia post at approximately 3:00 a.m., dressed in civilian clothing. McCormick was visibly upset and agitated and complained several times that his stomach was upset. He explained his presence at the Xenia post by stating that he had received a partial page containing digits from his home number in Miamisburg. Fearful that something had happened to his son, he left the Academy and drove to Xenia, but he failed to stop at the home where his son lived, which was in close proximity to the Xenia post, to determine his son's condition. McCormick continued to pace back and forth at the Xenia post, and repeatedly complained that he did not feel well and asked if there were any antacids for his stomach. At one point prior to his arrest, McCormick asked "What's wrong with my wife?" Additionally, his weapon was located in the trunk of his vehicle.
 {¶ 89} We find, based upon the totality of the circumstances, that a reasonable, prudent person would have believed that McCormick shot Tara. The arrest of McCormick was supported by probable cause and was lawful, and McCormick's Fourth Amendment rights were not violated.
 {¶ 90} McCormick's final assignment of error is overruled.
 {¶ 91} The judgment of the trial court is affirmed.
FAIN, P.J., and WOLFF J., concur.