OPINION
{¶ 1} Chatiya C. Cranford entered a plea of no contest in the Montgomery County Court of Common Pleas to one count of burglary after the trial court overruled her motion to suppress. The court found her guilty and sentenced her to five years of community control. Cranford appeals from her conviction.
 {¶ 2} The state's evidence from the suppression hearing reveals the following facts.
 {¶ 3} On November 22, 2003, Tanisha Graham contacted the police to report that a DVD player, $320, and several other items had been taken from her Northland Village apartment. During the sheriff's department investigation, fingerprints were found on an outside window. On December 18, 2003, the Miami Valley Regional Crime Laboratory ("MVRCL") reported that the fingerprints belonged to Cranford. On February 3, 2004, Detective Kent Saunders contacted Graham about the fingerprints that had been found. According to Saunders, Graham stated that Cranford was a friend of hers and that Cranford had been to her home. However, Graham indicated that Cranford had never been to the back of the house except for one occasion when she had exited through the back door. Graham stated that Cranford had "never touched any windows or anything like that" and that there was no reason why her prints would be on the windows.
 {¶ 4} During the early afternoon of February 5, 2004, Saunders went to Cranford's apartment to speak with her. Saunders testified that he "felt that [he] had enough probable cause to arrest her for the burglary. My intentions were to arrest her. However, I wanted to interview her and I really — instead of making it a hostile situation whereas that she may not want to be interviewed, I tried to be more relaxed in approaching her so that that way we could talk."
 {¶ 5} Saunders arrived at Cranford's apartment and knocked on the door. Cranford yelled out of an upstairs window, "Are you with the court?" Saunders responded, "Well, kinda." Cranford came downstairs to open the door. Initially, she was smiling and acted friendly. After opening the door, Cranford asked, "Okay, who are you?" Saunders answered, "My name's Detective Saunders. I'm with the Sheriff's Office." Saunders testified that Cranford's "eyes got real big and she went to slam the door in my face." However, Saunders placed his foot inside the door to keep it from closing completely. Saunders testified: "At that point I reached and I grabbed her with my hand and I was able to go ahead and kind of get her away from the door and put handcuffs on her at that time and place her under arrest." Cranford did not make any statements at this time, and her apartment was not searched. Saunders called for a marked cruiser, which transported Cranford to Station No. 10.
 {¶ 6} Upon reaching the station, Cranford was placed in an interview room and read her Miranda rights. Cranford signed the Miranda waiver form. During the ensuing interview, she initially denied involvement with the burglary of Graham's apartment. Cranford told Saunders that she had been in Graham's home and had once exited the rear door. However, she denied having touched any windows. At this pont, Saunders showed Cranford the MVRCL fingerprint report. After additional denials, Cranford indicated that she gained entry to Graham's apartment by standing on a grill outside the window. Cranford subsequently provided a written statement, in which she admitted that she had entered Graham's apartment through a window, took a VCR and $180, and left through the back door. Cranford was then transported to the county jail and booked on the burglary charge.
 {¶ 7} Cranford's version of the events of February 5, 2004, varies from Saunders' in several important respects. Cranford testified that she opened the door for Saunders believing that he was an attorney who had been sent by her counsel in her children's services case. She stated that, when she opened the door, he stepped in, twisted her arm, pushed her against her refrigerator, and handcuffed her. Cranford testified that she could not see Saunders' badge because his coat was buttoned, and that Saunders did not identify himself as a law enforcement officer until she was handcuffed.
 {¶ 8} Cranford acknowledged that she signed the Miranda form. However, she testified that Saunders "kept throwing the case I have at Children's Service up" and said that he had talked with her case worker. Cranford stated that she had confessed to the burglary after Saunders repeatedly told her that she was going to jail and that he did not believe her, and because she was tired and needed to use the restroom. Cranford indicated that she wrote her statement based on information about the burglary that she had received from Saunders.
 {¶ 9} Cranford was indicted for burglary, in violation of R.C.2911.12(A)(3), a felony of the third degree. On March 23, 2004, she moved to suppress her statements, on the grounds that they were not voluntarily made and that her statement was given immediately after an unlawful arrest. A hearing on the motion was held on May 7, 2004. On June 1, 2004, the trial court overruled the motion. As part of its findings, the court found that when Cranford answered the door, Saunders "kept her from closing the door, entered her residence and placed her under arrest slightly inside the front door." The court concluded that Cranford's arrest was constitutional, reasoning that the detective had probable cause to arrest Cranford, based on the fingerprint evidence, and that Cranford could not retreat into her home to thwart the arrest. The court further concluded that Cranford had waived her Miranda rights and that her confession need not be excluded as fruit of the poisonous tree. As a result of the court's ruling, Cranford entered a no contest plea to the burglary charge.
 {¶ 10} In her sole assignment of error, Cranford asserts that the trial court erred in denying her motion to suppress. Specifically, she claims that the trial court erroneously concluded that there was probable cause for her arrest and that the warrantless arrest was constitutional because it occurred at her front door. Cranford argues that there were no exigent circumstances permitting the officer to enter her home in order to make the arrest. She further argues that she was not in a public place at the time of her arrest such that a warrant was not required. Finally, Cranford contends that her subsequent statements should be suppressed as fruit of the unlawful arrest.
 {¶ 11} The Fourth Amendment to the United States Constitution provides that people are "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, . . . and no Warrants shall issue, but upon probable cause. . . ." Although both probable cause and a warrant are generally required to effectuate a search or a seizure, "[a] warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." Maryland v. Pringle (2003), 540 U.S. 366, 370,124 S.Ct. 795, 157 L.Ed.2d. 769. "[A] warrantless entry and search of a private residence is presumptively unreasonable. Payton v. New York
(1980), 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639; Welch v. Wisconsin
(1984), 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732. * * * The government must overcome the presumption that warrantless searches of homes are per se unreasonable by demonstrating that the search falls within one of the few, wellrecognized exceptions to the warrant requirement. Welsh v.Wisconsin, supra; State v. Kessler (1978), 53 Ohio St.2d 204,373 N.E.2d 1252." State v. McCormick, Montgomery App. No. 19505, 2003-Ohio-5330, at ¶ 78; Kirk v. Louisiana (2002), 536 U.S. 635,122 S.Ct. 2458, 153 L.Ed.2d 599.
 {¶ 12} In the present case, we agree with the trial court that Saunders had probable cause to arrest Cranford. "Probable cause exists when the arresting officer has sufficient information from a reasonably trustworthy source to warrant a prudent person in believing that the suspect has committed or was committing the offense." State v. Howell,
Montgomery App. No. 19708, 2004-Ohio-2423, at ¶ 12, quoting State v.Otte (1996), 74 Ohio St.3d 555, 559, 660 N.E.2d 711 (citation omitted). "Whether probable cause exists is determined from the totality of the facts and circumstances." McCormick at ¶ 87; State v. Hill (October 26, 2001), Montgomery App. No. 18569, 2001-Ohio-1649.
 {¶ 13} Here, fingerprints, which were matched to Cranford by the MVRCL, had been found on an outside window through which the offender apparently had entered. Graham had told Saunders that Cranford had been to her apartment, but that she had had no occasion to touch that window. A reasonable officer under these circumstances would be justified in believing that Cranford had burglarized Graham's apartment. Accordingly, the trial court did not err in concluding that probable cause to arrest Cranford existed.
 {¶ 14} As stated, supra, in order for the warrantless arrest of Cranford to be lawful, either Cranford must have been in a public place or there must have been exigent circumstances justifying Saunders' entry into her residence. The state does not assert that exigent circumstances were present. Rather, it argues that the trial court properly relied uponUnited States v. Santana (1976), 427 U.S. 38, 96 S. Ct. 2406, 49 L.E.2d 300, to conclude that Cranford was in a public place when she stood at her open front door, and that she could not retreat into her apartment to elude arrest. In Santana, the Supreme Court upheld the warrantless arrest where the police first approached the defendant as she stood in the open doorway of her home and they arrested her inside her home after she had retreated inside.
 {¶ 15} Although not conceding error by the trial court, the state acknowledges that the factual circumstances presented here are similar to those in State v. Norris (1999), Montgomery App. No. 17689. In Norris,
the police went to a motel to locate the defendant after receiving a domestic violence complaint from his wife. The officers knocked on Norris's motel room door, and Norris answered. Norris identified himself to the officers but did not invite them to enter. One of the officers informed Norris that he was under arrest and asked him to put his hands behind his back. When Norris refused to remove one of his hands from his pocket, the officer entered the motel room, and attempted to handcuff Norris. The other officers also entered and a struggle ensued. Norris was handcuffed; the officers discovered cocaine during a pat-down search.
 {¶ 16} Norris moved to suppress the evidence. The trial court overruled the motion, reasoning that Norris had exposed himself and his hotel room to public view by opening the door. The trial court thus concluded, citing Santana, that Norris was in a "public place" and could not retreat into the confines of his motel room. We reversed, finding the critical fact to be that Norris was at all times inside his hotel room. We stated:
 {¶ 17} "Given the fact that Norris was at all times inside his motel room, if only by a few feet, Payton clearly commands that, absent exigent circumstances, his arrest could only be by warrant, notwithstanding that a state statute authorized a warrantless arrest (which was the same situation involved in Payton)."
 {¶ 18} We find Norris to be controlling. As in that case, Cranford opened the door for Saunders after he had knocked and indicated that he was "kinda" from the courts. There is no evidence that Cranford ever stepped into the open doorway or exited her home. Rather, upon learning that Saunders was with the Sheriff's Department, Cranford attempted to close the door. As found by the trial court, Saunders prevented her from doing so, and he "entered her residence and placed her under arrest slightly inside the front door." Because Cranford was, at all times, within her apartment, Cranford was not in a public place. Accordingly, absent exigent circumstances, Saunders was required to have a warrant to effectuate her arrest. See also Kirk, 536 U.S. at 638 ("As Payton makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.")
 {¶ 19} As stated above, the state has not asserted that exigent circumstances existed which would justify the detective's entry into Cranford's apartment. Upon review of the record, we likewise find no exigent circumstances were present. Cranford obviously did not consent to the officer's entrance, as is apparent from the fact that she attempted to close the door and terminate their encounter. Accordingly, we conclude that Saunder's warrantless arrest was unconstitutional.
 {¶ 20} Because Cranford's arrest was unconstitutional, we turn to whether the statements she made at the station should have been excluded as fruit of the poisonous tree.
 {¶ 21} "The exclusionary rule is a judicially created remedy applied to exclude evidence from the government's case in chief when it has been obtained by police through an illegal search or seizure in violation of the Fourth Amendment. Mapp v. Ohio (1961), 367 U.S. 643, 81 S.Ct. 1684,6 L.Ed.2d 1081. The exclusionary rule applies not only to primary evidence directly obtained by police during an illegal search or seizure but also to `derivative evidence,' that is, evidence discovered from knowledge gained by the police as a result of the illegal search or seizure. Silverthorne Lumber Co. v. U.S. (1920), 251 U.S. 385, 40 S.Ct. 182,64 L.Ed. 319. Derivative evidence is known as `fruit of the poisonous tree.' Nardone v. U.S. (1939), 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307."State v. Kelly (Sept. 24, 1993), Clark App. No. 3007.
 {¶ 22} "In order for derivative evidence to be suppressed, the evidence must have been obtained by exploitation of the illegal search or seizure, and therefore be tainted by it. In applying the exclusionary rule, courts do not utilize a `but for' test, which would include any evidence that would not have come to light but for the search [or seizure] performed by the police. Instead, the evidence must be the product of the illegality concerned." State v. Freeman, Montgomery App. No. 18798, 2002-Ohio-918 (citations omitted). "[T]he fruit-of-the poisonous-tree doctrine is generally subject to three qualifications: (1) the independent source doctrine; (2) the inevitable discovery rule; and (3) the attenuated connection principle." United States v. Stamper (C.A.6 Mar. 3, 2004), Case No. 02-6389.
 {¶ 23} Cranford claims that her confession was obtained after a clear violation of the warrant requirement and without probable cause. She further asserts that her confession was coerced by "threats, intimidation and fear that a failure to tell the detective what he wanted to hear would negatively impact on her Children's Service case. Nothing in the facts suggests that there was any intervening circumstance that may have served to separate the confession from the illegal arrest." Cranford asserts that application of State v. Crouch (June 25, 1999), Montgomery App. No. 17520, requires the exclusion of her confession. Citing New Yorkv. Harris (1990), 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13, the state responds that, even if Cranford's arrest was unconstitutional for violating Payton, Cranford's subsequent confession at the station is not subject to the exclusionary rule.
 {¶ 24} The Supreme Court of the United States first addressed the issue of confessions as a fruit of an illegal arrest in Wong Sun v.United States (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. The court noted that "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the `fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." Id. at 485. The relevant question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. at 487-88; seeKaupp v. Texas (2003), 538 U.S. 626, 632, 123 S.Ct. 1843.
 {¶ 25} In three subsequent cases — Brown v. Illinois (1975),422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416; Dunaway v. New York (1979),442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824; and Taylor v. Alabama
(1982), 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314, the Supreme Court excluded the defendants' confessions after they were arrested without probable cause.
 {¶ 26} "In Brown, the Court stated that the giving of Miranda
warnings, though relevant to a determination of whether a confession was obtained by exploitation of the illegal arrest, was not dispositive. Id.
at 603. Once it is determined, as a threshold matter, that the confession was voluntary, a court must consider whether the confession was so attenuated from the illegal arrest as to purge it of the primary taint.Id. at 603-4. The temporal proximity of the confession to the illegal arrest, whether there were any intervening circumstances that served to separate the confession from the illegal arrest, and the purpose and flagrancy of the official misconduct are relevant factors to be considered in deciding the admissibility of the confession. Id. In articulating this multi-factored test, the Court rejected a `but for' approach to admissibility of a confession following an illegal arrest, and recognized that `persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality.'Id. at 603. In Brown's case, two hours had passed between the time of his illegal arrest and his confession, and the Court found the illegal conduct by the police purposeful. Therefore, Brown's confessions were suppressed." Couch, supra (discussing Brown).
 {¶ 27} In Harris, the sole issue was whether the defendant's statement should have been suppressed because the police had entered his home, in violation of Payton, "which held that the Fourth Amendment prohibits the police from effecting a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Harris,495 U.S. at 16. As we noted in Couch, the Harris Court distinguished the situation in Harris from those in Brown, Dunaway, and Taylor in that the police had probable cause to arrest Harris before they arrested him illegally. In so doing, the Court stated:
 {¶ 28} "In each of those cases, evidence obtained from a criminal defendant following arrest was suppressed because the police lacked probable cause. The three cases stand for the familiar proposition that the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality. See also Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407,9 L.Ed.2d 441 (1963). We have emphasized, however, that attenuation analysis is only appropriate where, as a threshold matter, courts determine that `the challenged evidence is in some sense the product of illegal governmental activity.' (Cite omitted.) * * * Harris' statement taken at the police station was not the product of being in unlawful custody. Neither was it the fruit of having been arrested in the home rather than someplace else." Harris, 495 U.S. at 18-19.
 {¶ 29} "The nature of the illegality in Harris' case was that the police entered Harris' home without his consent or a warrant, and absent any exigent circumstances to effectuate his arrest. * * * [O]nce Harris had been removed from his home, the preexisting probable cause provided a legitimate basis for his arrest, without release and rearrest, and any statement thereafter made by Harris, the Court reasoned, was not the fruit of his having been arrested in his home rather than someplace else. Id. at 20. The holding of the case was cogently stated in the last paragraph of the majority opinion: `[W]here the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation ofPayton.' Id. at 21. Essentially, the Court held that, at least in situations where the constitutional infirmity rendering an arrest illegal is a violation of the rule in Payton, removal of a suspect from the place protected by Payton and the giving of Miranda warnings will purge any subsequent statements by the suspect of the taint of the illegal arrest."Couch, supra.
 {¶ 30} Applying Couch's factual circumstances to the case law, we found Harris to be distinguishable. We noted that "[r]emoval from the place of the constitutional violation in Harris was significant since the police conduct was illegal because of the place in which it wasconducted, and for no other reason." In contrast, Couch had been stopped in a car for alleged traffic violations without probable cause. We stated: "The illegality of Couch's arrest had nothing whatsoever to do with the fact that it was effected in the 1200 block of Brennan Drive in Dayton, Ohio. Therefore, removing Couch from that location does nothing to purge the taint of his illegal arrest from the confessions he later made." Couch, supra. We then analyzed whether Couch's confession should be suppressed under Brown and its progeny, including Harris. Applying theBrown factors, we determined that Couch's confessions concerning the two breaking and entering offenses, although following his illegal arrest by only two hours, were sufficiently attenuated from the arrest so as to purge from them the taint of the initial illegality. Couch, supra.
 {¶ 31} In the present case, Saunders had probable cause to arrest Cranford for burglary based on the fingerprint that was found on an outside window and Graham's statement that Cranford had had no reason or occasion to touch that window. Cranford's home was not searched, and no physical incriminating evidence was discovered as a result of her arrest. The only evidence that was gathered as a result of Cranford's arrest was her confession, which was obtained at the police station and afterMiranda warnings had been issued. Thus, the only constitutional infirmity was that Cranford's arrest occurred inside her home without a warrant.
 {¶ 32} These factual circumstances are analogous to Harris, and we find that case to be applicable. Once Cranford was taken from her apartment, "the preexisting probable cause provided a legitimate basis for [her] arrest, without release and rearrest, and any statement thereafter made by [Cranford] * * * was not the fruit of [her] having been arrested in [her] home rather than someplace else." Couch, supra (summarizingHarris); see also Stamper, supra; United States v. Smith (C.A.7 Apr. 28, 2003), Case No. 02-1603; U.S. v. Crawford (C.A.9 2004), 372 F.3d 1048,1055 ("despite the illegal arrest inside the defendant's home, the exclusionary rule did not bar the admission of the defendant's later statement to officers at the station house"). Because Cranford's statement "was not the fruit of the fact that the arrest was made in the house," we need not conduct an attenuation analysis. Harris,495 U.S. at 20. Accordingly, based on Harris, the trial court did not err in overruling Cranford's motion to suppress.
 {¶ 33} Although we need not conduct an attenuation analysis, Cranford has asserted that her confession was not voluntary. She emphasizes that she was coerced into making a confession by threats that a failure to do so would negatively affect her Children's Services case. The record supports that Cranford was advised of her Miranda rights before being questioned, and that she executed a written waiver acknowledging that she understood her rights and was willing to waive them and speak with the detective. She was interviewed by Saunders for less than one hour. Although Cranford indicated that she confessed, in part, because she needed to use the restroom, the record does not indicate that she requested to go to the restroom and her request was denied. Moreover, although Cranford claims that Saunders repeatedly indicated that he did not believe her and kept mentioning her Children's Services case, the record does not indicate that there was police coercion or overreaching that would render Cranford's statement involuntary.
 {¶ 34} The assignment of error is overruled.
 {¶ 35} The judgment of the trial court will be affirmed.
Donovan, J. and Young, J., concur.
(Hon. Frederick N. Young sitting by assignment of the Chief Justice of the Supreme Court of Ohio).