**The STATE of Ohio, Appellee,**

v.

**GABRIEL, Appellant.**

[Cite as *State v. Gabriel,* 170 Ohio App.3d 393, 2007-Ohio-794.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 21343.

Decided Feb. 23, 2007.

</div>

396

Mathias H. Heck, Montgomery County Prosecuting Attorney, and Carley J. Ingram, Assistant Prosecuting Attorney, for appellee.

Mark A. Fisher, for appellant.

---

WOLFF, Presiding Judge.

{¶ 1} Christian J. Gabriel was convicted by a jury in the Montgomery County Court of Common Pleas of tampering with evidence, in violation of R.C. 2921.12(A)(1), and gross abuse of a corpse, in violation of R.C. 2927.01(B). The

court sentenced Gabriel to five years in prison for tampering with evidence and to one year in prison for gross abuse of a corpse, to be served consecutively. Gabriel appeals from his convictions and sentences.

{¶ 2} The charges against Gabriel stemmed from the disappearance of nine-year-old Erica Baker on Sunday, February 7, 1999. According to the state's evidence, between 3:00 p.m. and 3:15 p.m. on February 7, 1999, Erica left her home near the Kettering Recreation Center ("KRC") to walk her dog. It was a rainy day, and the area was generally quiet. At approximately 3:45 p.m., a couple who had come to the KRC to walk their dog around the pond saw Erica leaving the pond area of the KRC and walking toward the track of Indian Ripple Middle School. A short time later, the couple found Erica's dog, shivering, shaking, and wet, in the doorway of a building at the middle school. They did not see Erica, and she has not been seen or heard from since.

{¶ 3} Beginning that evening, a massive search effort was undertaken by the Kettering Police Department, in conjunction with numerous other local jurisdictions and the Federal Bureau of Investigation. The police investigation ultimately led Kettering detectives to Gabriel.

{¶ 4} On July 14, 1999, two Kettering detectives contacted Gabriel at his residence near Jeffersonville, Ohio. At that time, Gabriel indicated that he, Clifford Butts, and Jan Franks had been stealing from the Kettering Meijer store on February 7, 1999. He further stated that "something could have happened" when they were returning in his van to his residence at the Duck Inn in Dayton.

{¶ 5} On February 23, 1999, Gabriel had sold the van to Kevin Smith, and the van was subsequently impounded by the Dayton Police Department. In July 1999, the van was taken to the Miami Valley Regional Crime Laboratory ("MVRCL"). After examining the van for blood and trace evidence, the forensic scientists found no evidence linking the van to Erica Baker. The Kettering detectives had no further contact with Gabriel until 2004.

{¶ 6} On April 6, 2004, Kettering detectives reinitiated contact with Gabriel about the Erica Baker case. Gabriel indicated that he had lent his van to Smith on February 7, 1999. Following that interview, Kettering police officers attempted to conduct surveillance of Gabriel in the hope that Gabriel would lead officers to Erica's body. The surveillance was unsuccessful because the officers were spotted on several occasions, and the surveillance ceased after six sporadic days.

{¶ 7} On July 19, 2004, Gabriel was arrested by the Clark County Sheriff's Office on a charge of receiving stolen property. While smoking at the Clark County Sheriff's Office prior to entering the building, Gabriel stated that he was a passenger in the van that struck Erica Baker. Gabriel indicated that Franks had been driving. Gabriel was taken inside and placed in an interview room.

During the interview, Gabriel stated that on February 7, 1999, he was stealing from Meijer with Franks, Clifford Butts, and Butts's girlfriend. Jan drove the van when they left Meijer. Gabriel stated that the van had hit Erica, that the others had put her body in the van, and that they had driven back to his apartment, where they smoked crack cocaine. Later, they drove Erica to Huffman Dam, and the others buried her. Gabriel indicated that he had wanted to take Erica to a hospital. After the interview, Gabriel accompanied officers to Huffman Dam to search for Erica's body. Gabriel returned with officers the following day. Her body was not located.

{¶ 8} Kettering detectives spoke with Gabriel again in November and December 2004. On December 13, 2004, Gabriel confessed that he had been driving the van that hit Erica and that Franks had directed him to a park, where Erica was buried. On December 21 and 22, 2004, Gabriel drove with Kettering detectives, demonstrating the route he had taken from the Meijer store, and he attempted to find Erica's grave. On December 22, 2004, Gabriel described how he had buried Erica at Caesar's Creek. Despite additional searches by police officers, Erica's body has not been found.

{¶ 9} On February 4, 2005, Gabriel was indicted for tampering with evidence, a felony of the third degree, and gross abuse of a corpse, a fifth-degree felony. On April 26, 2005, he filed a motion to suppress all statements that he had made to the police and all physical evidence seized by law enforcement. On July 15, 2005, the trial court overruled the motion to suppress. On September 23, 2005, Gabriel filed a motion for a change of venue, citing extensive adverse publicity in the newspapers and on television. At the conclusion of voir dire, the court denied the motion to change venue. Gabriel was tried before a jury, and he was convicted of both counts. As stated above, the court sentenced Gabriel to an aggregate term of six years of imprisonment for the offenses.

{¶ 10} Gabriel raises seven assignments of error on appeal, which we will address in an order that facilitates our analysis.

{¶ 11} II. "The trial court erred in overruling appellant's motion to suppress as the statements he made to law enforcement were not made voluntarily and free of coercion."

{¶ 12} In his second assignment of error, Gabriel claims that the trial court erred in failing to suppress his statements made to the police during various interviews.

{¶ 13} In his motion to suppress, Gabriel requested an order suppressing all statements made by him on the grounds that he was not advised of his *Miranda* rights prior to the interrogations and that, due to police coercion, his statements were not voluntarily given. Gabriel also challenged the search of the van. The

court rejected each of these alleged grounds for suppression. On appeal, Gabriel has not challenged the trial court's ruling that he was properly informed of his *Miranda* rights and that he had knowingly, voluntarily, and intelligently waived those rights prior to making statements. Nor has he challenged the court's ruling that any evidence obtained from the van was admissible. Accordingly, we will address only whether his statements were made voluntarily.

{¶ 14} At the outset, we note that whether a statement was made voluntarily and whether an individual knowingly, voluntarily, and intelligently waived his right to counsel and right against self-incrimination are distinct issues. *State v. Eley* (1996), 77 Ohio St.3d 174, 178, 672 N.E.2d 640; *State v. Kelly*, Greene App. No. 2004–CA–20, 2005-Ohio-305, 2005 WL 182900. Regardless of whether *Miranda* warnings were required and given, a defendant's statement may have been given involuntarily and thus be subject to exclusion. *Kelly*, 2005-Ohio-305, 2005 WL 182900, at ¶ 11.

{¶ 15} "The test for voluntariness under a Fifth Amendment analysis is whether or not the accused's statement was the product of police overreaching." *State v. Finley* (June 19, 1998), Clark App. No. 96–CA–30, 1998 WL 321017; *State v. Dailey* (1990), 53 Ohio St.3d 88, 92, 559 N.E.2d 459, citing *Moran v. Burbine* (1986), 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410. "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, at paragraph two of the syllabus; see *State v. Brewer* (1990), 48 Ohio St.3d 50, 58, 549 N.E.2d 491; *State v. Marks*, Montgomery App. No. 19629, 2003-Ohio-4205, 2003 WL 21832754.

{¶ 16} Whether a statement was voluntarily given is a question of law, which we review de novo. *Arizona v. Fulminante* (1991), 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302; *State v. Booher* (1988), 54 Ohio App.3d 1, 7, 560 N.E.2d 786. "However, weighing the evidence and determining witness credibility at suppression hearings are matters within the sound discretion of the trial court." *State v. Sutphin* (June 30, 1999), Greene App. No. 98CA140, 1999 WL 961291.

{¶ 17} According to the evidence presented at the suppression hearing, Gabriel gave more than a dozen statements between 1999 and 2005, as follows.

{¶ 18} On July 14, 1999, Kettering detectives Steve Driscoll and Rick Renner spoke with Gabriel at his apartment near Jeffersonville, Ohio. Driscoll testified that they knocked on Gabriel's door, identified themselves as detectives for

Kettering, and asked to speak with Gabriel. Gabriel admitted the detectives into his apartment. Driscoll indicated that they had explained to Gabriel that they were investigating the Erica Baker case, that they had advised Gabriel of his constitutional rights, and that Gabriel had agreed to speak with them. The three spoke for approximately 15 to 20 minutes in Gabriel's bedroom. After the conversation, Gabriel agreed to ride with the officers to the Kettering police department for a more in-depth interview. Driscoll described the conversation at the house and in the car as very relaxed and "light-hearted at times." He indicated that they stopped for fast food on the way to Kettering, that Gabriel spoke with them and came with them voluntarily, that he was not handcuffed, and that there were no threats or promises.

{¶ 19} At the Kettering police department, Gabriel spoke with Detective Thomas Shaw. According to Shaw, Gabriel was informed of his *Miranda* rights, and he voluntarily waived those rights. Shaw testified that Gabriel was not mistreated, physically abused, threatened, or given any promises. Shaw did not recall whether Gabriel ate or drank, but he indicated that he usually offers water. Gabriel was returned to his home, and detectives had no further contact with him until April 2004.

{¶ 20} On April 6, 2004, Detective Robert Green and Lieutenant Wendell Willcox of the Kettering Police Department approached Gabriel in a vacant parking lot at the rear of a house in Springfield, Ohio. Green testified that they drove up to his truck, got out of their vehicle, and identified themselves. After Gabriel waived his *Miranda* rights, they spoke with him for approximately 15 minutes. Green stated that Gabriel was not placed under arrest, that he had not been given any promises or threats, and that there had been no mistreatment. Green described the interview as "cordial" and without any "confrontation whatsoever."

{¶ 21} On July 19, 2004, Green was contacted by Detective Jim Davis of the Clark County Sheriff's Office. Davis informed Green that Gabriel was going to be arrested on a warrant for receiving stolen property and asked whether this arrest would compromise the Kettering investigation. Green indicated that it would not, but stated that he would be very interested if Gabriel said anything about the Erica Baker case.

{¶ 22} Deputy Robert Wise and Detective Larry Alexander of the Clark County Sheriff's Office served the arrest warrant for receiving stolen property on Gabriel at his home in Springfield. Wise testified that he knocked on the door, Gabriel answered, and Wise asked him to step out on the porch. Gabriel begged that he not be taken to jail that day because he was watching his baby. Wise informed Gabriel that he would be arrested and "processed" on the receiving-stolen-property charge but that he would not be jailed overnight. After deter-

mining that Gabriel's child was not in the house, Gabriel was handcuffed and taken to the Clark County Sheriff's Office. According to Wise, while Gabriel was being transported to the sheriff's office, he started "going off" about how the Kettering police department "was messing with him." Gabriel stated, "[T]he cops have been screwing with me. * * * Kettering's been screwing with me over the Erica Baker case."

{¶ 23} Gabriel requested an opportunity to smoke before going inside the sheriff's office. While smoking, Gabriel stated that "he was a passenger in the van that struck that girl." Alexander stopped Gabriel and told him that they needed to set up an interview room. Alexander then left and Gabriel remained with Deputy Wise. Wise then told Gabriel: "I can tell by your demeanor that you're getting something off of your chest that you've had on your chest for a long time. When you go upstairs, you need to tell them what's going on and then get it out in the open and get it over with." Gabriel stated that Erica's body was at Huffman Dam.

{¶ 24} Gabriel was taken to an interview room, where he was interviewed by Wise and Alexander. Green observed the interview on a television monitor in another room. At the beginning of the interview, Alexander read Gabriel his *Miranda* rights, and Gabriel indicated that he understood and waived those rights. At the beginning of and during the interview, Gabriel again expressed concern that he was going to go to jail. Alexander assured Gabriel that he would be processed and booked into jail, but he would not be held on the receiving stolen property charges that day. Alexander further told Gabriel that Kettering officers would not arrest him that day. During the interview, Gabriel stated that he would be willing to take the officers to Erica's grave. At this juncture, Green entered the interview room and confirmed with Gabriel that he had been advised of his rights and that he had waived them. Gabriel indicated that he still agreed to take the investigators to the whereabouts of Erica's remains. Wise testified that there had been no threats or mistreatment, that Gabriel had cooperated, and that he had not been forced to go to Huffman Dam. After searching Huffman Dam, Gabriel agreed to talk with Green on the following day to provide more information on Erica's possible whereabouts. Gabriel was transported back to the Clark County Sheriff's Office, where he was processed on the receiving-stolen-property charge. He was then taken home.

{¶ 25} On July 20, 2004, Green received a call from Gabriel, who was using Wise's telephone. Green asked Gabriel whether he would be willing to return to Huffman Dam. Gabriel agreed. At Huffman Dam, Gabriel was not handcuffed, he was fed lunch, and no threats or promises were made. Gabriel was transported back to his home.

{¶ 26} According to Green, Gabriel and he had made arrangements to meet again on July 21, 2004. Both believed that Gabriel's court date for the receiving-stolen-property charge was July 21, 2004, and Gabriel agreed to provide a written statement after his court appearance. Green picked up Gabriel at his home and took him to Clark County Court. Upon their arrival, they learned that the court date had been the previous day, when Gabriel was at Huffman Dam. Green contacted Detective Davis, who indicated that he "would be willing to take care of the court issue." Gabriel agreed to provide a written statement while the court issue was being addressed.

{¶ 27} In an interview room, Gabriel was again advised of his rights, and he waived them. Gabriel provided a written statement and responded to questions about a map, drawn by Green, of the area where Erica was struck. Green indicated that Gabriel was very cooperative in giving this information and that there were no threats. Green later found an initial version of Gabriel's written statement in the trash can in the room.

{¶ 28} On November 19, 2004, Green and Alexander met with Gabriel at the Corrections Reception Center ("CRC") in Orient, Ohio, where he was an inmate. Gabriel waived his *Miranda* rights, and they spoke for approximately one and one-half hours, during which Gabriel made an oral statement. Green testified that Gabriel was angry during this meeting. Gabriel said that he was "tired of this" and blamed the Kettering police for "messing up his life." Green stated that Gabriel was not threatened, did not receive any promises, and was not mistreated.

{¶ 29} On December 10, 2004, Green received a telephone call from Jon Fausnaugh, an investigator at CRC, who put Gabriel on the line. Gabriel was upset and told Green that he had made statements to "get [Green] off his back." Gabriel also stated that Clark County had promised him that he would not be arrested on the receiving-stolen-property charge. Green responded that those allegations were "ridiculous." Gabriel requested that Green come to speak with him at CRC.

{¶ 30} On December 13, 2004, Green and Willcox went to CRC and spoke with Gabriel in the deputy warden's office. Gabriel was again advised of his *Miranda* rights, and they were waived. Gabriel provided a written statement, and Green drew a map with Gabriel's assistance. Green testified that Gabriel was not forced to make a statement or to draw a map. Again, he indicated that no threats or promises had been made.

{¶ 31} On December 21, 2004, Green and Willcox picked up Gabriel from CRC because Gabriel had agreed to show them the route he had driven on February 7, 1999. Gabriel executed another *Miranda* form before leaving CRC. Gabriel made oral statements en route to Kettering. Gabriel directed the officers from

the Meijer store in Kettering to other locations in Kettering and Dayton, as well as Caesar's Creek. Afterward, Gabriel was taken to the Kettering Jail. Gabriel requested a map of Caesar's Creek to review over the evening. The next day, Gabriel showed Green a location at Caesar's Creek and made additional statements. Gabriel was then returned to CRC.

{¶ 32} On January 12, 2005, Green and Kettering detective Voehringer spoke with Gabriel at CRC. Green indicated that they had searched Caesar's Creek and that he did not believe that Gabriel had been honest with him. Green testified that no promises or threats were made.

{¶ 33} On February 4, 2005, Gabriel made statements to warden Mark Saunders and deputy warden Darrell Cunningham while he was being housed in the segregation area at Southeastern Correctional Institute. According to Saunders, Gabriel stopped them while they were making their rounds and asked who they were. After Saunders identified himself as a warden, Gabriel stated that he did not want to be in segregation, that he had already confessed, that he was going to be indicted by Montgomery County, and that there was no reason to keep him segregated. Saunders testified that Gabriel indicated that he did not know where the body was. When Saunders asked why not, Gabriel responded that he had been new to Dayton and did not know the area well. Saunders informed Gabriel that he appreciated the information but that they were going to keep him in segregation until they had further assurance that he could be safely out in the compound. Saunders stated that he did not threaten Gabriel or physically abuse him.

{¶ 34} On February 7, 2005, Saunders received a written statement from Gabriel. Saunders indicated that this was unsolicited and that he did not command Gabriel to write anything on February 4, 2005.

{¶ 35} During cross-examination, Gabriel elicited additional testimony from Detective Green concerning the Kettering police department's surveillance of him. According to Green, on April 6, 2004, officers were assigned to contact different members of Gabriel's family in person. On that date, officers also placed a tracking device on Gabriel's vehicle. When the truck was parked at Ryan's Steak House, where Gabriel's girlfriend worked, Gabriel's girlfriend caught Kettering police officers attempting to move the tracking device on the vehicle. Green acknowledged that the officers were caught conducting surveillance on several occasions, and the surveillance was terminated for that reason. Green further indicated that he had spoken with Gabriel's employer in late April 2004.

{¶ 36} Upon review of the evidence submitted at the suppression hearing, we find no fault with the trial court's conclusions that all of Gabriel's statements were voluntarily given. There is no suggestion in the record that Gabriel's

conversations with officers on July 14, 1999, were anything other than congenial. In 2004 and early 2005, when the vast majority of encounters occurred, Gabriel was 33 years old, and he had obtained a general educational development credential ("GED"). None of the encounters between Gabriel and law enforcement officers involved police conduct that was threatening or abusive. There is no evidence that the interviews lasted an unreasonable length of time, and all occurred during daytime hours. Gabriel was not denied access to food, drink, or restrooms.

{¶ 37} Gabriel claims that his statements on July 19, 2004, were involuntary because he was promised that he would not be arrested. At the suppression hearing, Wise explained that due to the high jail population in Clark County, jail policy dictated that officers were not allowed to detain individuals except those who had failed to appear. Wise testified that there were many discussions with Gabriel about his going to jail and that he had informed Gabriel several times that he needed to be taken to the station to be "processed" (i.e., photographed, fingerprinted, and booked into jail) on the receiving-stolen-property charges but that he would not be physically placed in jail overnight. Wise testified that he informed Gabriel of this before Gabriel made any statements regarding Erica Baker. Davis reiterated that the processing and release of Gabriel was not a special favor but was due to jail policy.

{¶ 38} On these facts, we cannot conclude that Gabriel's will was overborne by the officers' assurances that Gabriel would not be jailed immediately. Wise's statements reflected that Gabriel would not be jailed immediately on the receiving-stolen-property charge. Gabriel was not, in fact, jailed that evening. Instead, he was returned to his home, as Wise had indicated. Moreover, Gabriel was not arrested on charges related to Erica Baker that day, as relayed by Alexander.

{¶ 39} Gabriel next argues that he was pressured into making statements by the Kettering police's surveillance and contact with his family. Although Green acknowledged that Kettering detectives had conducted sporadic surveillance in April 2004 and that detectives had contacted Gabriel's employer, girlfriend, and mother, the evidence presented at the suppression hearing does not support a conclusion that this conduct constituted police overreaching or was unduly coercive.

{¶ 40} Finally, Gabriel claims that officers repeatedly accused him of not being honest and told him that they did not believe him. Wise testified that he told Gabriel while they were at Huffman Dam on July 19, 2004, that he did not believe Gabriel and that he thought Gabriel knew more than what he was telling them. Green also acknowledged that he told Gabriel on January 12, 2005, that Gabriel's statement as to where Erica's body was located "did not make sense" due to the

water levels of the area that he had identified as Erica's grave. Although the officers' statements likely created some pressure on Gabriel to provide a different account of what had occurred, such statements were not unduly coercive. Upon review of the record, we are firmly convinced that all of Gabriel's statements were voluntary under the Due Process Clause.

{¶ 41} The second assignment of error is overruled.

{¶ 42} VII. "The trial court erred by refusing defense counsel's request for a change of venue which denied the appellant a fair trial."

{¶ 43} In his seventh assignment of error, Gabriel claims that the trial court erred in refusing his request for a change of venue due to the extensive pretrial publicity surrounding the case.

{¶ 44} "A motion for change of venue is governed by Crim.R. 18(B), which provides that a trial court may transfer venue 'when it appears that a fair and impartial trial cannot be held' in that court. * * * 'A change of venue rests largely in the discretion of the trial court * * *.' *State v. Fairbanks* (1972), 32 Ohio St.2d 34, 37, 61 O.O.2d 241, 289 N.E.2d 352. Moreover, 'a careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.'" *State v. Conway,* 109 Ohio St.3d 412, 418, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 33, quoting *State v. Davis* (1996), 76 Ohio St.3d 107, 111, 666 N.E.2d 1099.

{¶ 45} As amply reflected in the record, Erica Baker's disappearance has garnered substantial attention from the media and the community. At the beginning of voir dire, the trial court explained to the jury pool that "the law does not require, in order to be an acceptable juror, that a person have no prior knowledge of an event or even that a person has not previously formed or expressed an opinion about what they've seen or heard. The law does require that a juror is able to lay aside such opinion, put the acquired information out of [his] mind, and listen fairly to all the evidence and be uninfluenced by any previous information or opinions or any pressures in the community and render a fair and unbiased verdict."

{¶ 46} In order to ascertain the extent of the prospective jurors' pretrial exposure to the case, the trial court provided the prospective jurors with a list of categories in which to place themselves. The four categories read:

{¶ 47} "1) Jurors who are not familiar with the case, news accounts, parties, or attorneys and who have not formed an opinion whether the defendant is guilty or not guilty.

{¶ 48} "2) Jurors somewhat familiar with the case, with news accounts, parties, or attorneys who may recall some news broadcasts or writings but not the details and who have not formed an opinion whether the defendant is guilty or not guilty.

{¶ 49} "3) Jurors familiar with the case, news accounts, parties, or attorneys; jurors who followed news accounts and details and reports and who have recalled details or reports; and who formed or expressed an opinion whether the defendant is guilty or not guilty, but that opinion is not firmly held.

{¶ 50} "4) Jurors very familiar with the case, with news accounts, parties, or attorneys; closely followed news accounts and who have substantial recall of details of reports; and who have formed or expressed an opinion about whether the defendant is guilty or not guilty and that opinion is firmly held; or those who may have volunteered to assist in the search for the missing girl."

{¶ 51} Four individuals placed themselves in category one; 27 individuals placed themselves in category two; three individuals placed themselves in category three; and no one placed himself or herself in category four. The three individuals who placed themselves in category three were ultimately excused for cause. Consequently, all of the selected jurors were from categories one and two.

{¶ 52} Upon further questioning by the court, all of the jurors indicated that they did not believe that they belonged in category three or four. They all denied remembering specific details about what they had seen in the media, and they denied that they had formed or expressed an opinion about Gabriel's guilt that they could not put aside.

{¶ 53} Notwithstanding the pretrial publicity, we find no fault with the trial court's denial of the motion to change venue. Although several of the jurors indicated an awareness of the pretrial publicity, there is no evidence in the record that any of the jurors were influenced by that publicity or had formed any opinions based on that publicity. As for the three prospective jurors who had placed themselves in category three, the court conducted individual voir dire outside the hearing of the other jurors to avoid exposing the jury pool to any media reports or opinions beyond what they had already heard, and each was ultimately excused for cause. Under these circumstances, the trial court did not abuse its discretion in overruling the motion to change venue.

{¶ 54} The seventh assignment of error is overruled.

{¶ 55} I. "The court erred in convicting the appellant as there was no demonstration of corpus delicti."

{¶ 56} In his first assignment of error, Gabriel claims that his inculpatory statements should not have been admitted at trial, because the state failed to establish the corpus delicti of the alleged offenses.

{¶ 57} The corpus delicti of an offense consists of the act and the criminal agency of the act. *Edwards*, 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051. Before a confession of a crime may be admitted at trial, the state must introduce evidence independent of the confession to establish the corpus delicti of the offense. See *State v. Maranda* (1916), 94 Ohio St. 364, 114 N.E. 1038, paragraphs one and two of the syllabus; see, also, *State v. Van Hook* (1988), 39 Ohio St.3d 256, 261, 530 N.E.2d 883. The corpus delicti rule is designed to protect "persons who confess to crimes that they not only did not commit themselves, but which were never committed by anyone." *State v. Nobles* (1995), 106 Ohio App.3d 246, 261–62, 665 N.E.2d 1137. Accordingly, "this rule does not require evidence, other than the confession, showing that the accused committed the crime but, rather, requires some evidence that a crime was, in fact, committed." *State v. Hopfer* (1996), 112 Ohio App.3d 521, 561, 679 N.E.2d 321.

{¶ 58} "The evidence presented need not be so strong that it is capable of persuading a factfinder on some element of the crime beyond a reasonable doubt." *Nobles*, 106 Ohio App.3d at 262, 665 N.E.2d 1137. Nor must the evidence be "even enough to make it a prima facie case." *Maranda*, 94 Ohio St. 364, 114 N.E. 1038, at paragraph two of the syllabus. Rather, "[i]t is sufficient if there is some evidence outside of the confession that tends to prove some material element of the crime charged." Id. The corpus delicti rule does not require evidence related to all elements of the crime. *Van Hook*, 39 Ohio St.3d at 262, 530 N.E.2d 883. Furthermore, the evidence need not be direct but, rather, may be circumstantial. *State v. Nicely* (1988), 39 Ohio St.3d 147, 152, 529 N.E.2d 1236. Although the rule remains applicable, the Supreme Court has indicated that it need not be applied "with a dogmatic vengeance." *Edwards*, 49 Ohio St.2d at 36, 3 O.O.3d 18, 358 N.E.2d 1051.

{¶ 59} At trial and on appeal, Gabriel argues that the state did not present any evidence, prior to presenting his confessions, that connected him with the disappearance of Erica Baker. As stated above, evidence connecting Gabriel with Erica's disappearance is not required. Rather, the state was required to present evidence of the relevant criminal act and the criminal agency of that act.

{¶ 60} Gabriel was convicted of gross abuse of a corpse and tampering with evidence. The gross-abuse-of-a-corpse charge was premised on the allegation that Gabriel had treated Erica's corpse in a manner that would outrage the community by concealing its whereabouts and denying her and her family a proper burial. The state alleged that Gabriel tampered with evidence by removing Erica's body from the location where she was hit by the van. Both crimes, therefore, are premised on the allegation that Gabriel relocated Erica's body and improperly disposed of it. Consequently, before his inculpatory statements could be admitted as evidence that he committed either offense, there must

have been independent evidence that tended to show that Erica Baker was dead and that a corpse thus existed.

{¶ 61} The fact that an individual is missing is insufficient, by itself, to indicate that a person is dead. See *Nobles,* 106 Ohio App.3d at 262–63, 665 N.E.2d 1137. As we stated in *Nobles,* "[t]he *corpus delicti* rule was formed to prevent the conviction and punishment of persons who confessed to murdering someone who was never in fact murdered. It is always the case that a purported murder victim is, at the time of the confession, trial, conviction, and execution, missing. It is only when the supposed victim later appears that the state realizes what a ghastly mistake it has made." Id. at 263, 665 N.E.2d 1137.

{¶ 62} Prior to the presentation of Gabriel's statements at trial, the state presented the following evidence.

{¶ 63} In February 1999, Erica was a petite nine-year-old girl who resided at 3340 Pobst Drive in Kettering, Ohio, near the Kettering Recreation Center. Erica lived with her three brothers—Jason, Gregory and Logan; her mother, Melissa Baker; her aunt, Tara; her grandmother, Pam Schmidt; and Schmidt's husband, Mike. Erica's father, Greg Baker, resided in Huber Heights, and Erica had regular visitation with him. Erica had no independent means of support, she had no history of running away from home, and she did not express a desire to run away. Erica was a healthy child with no life-threatening illness.

{¶ 64} At approximately 2:30 p.m. on February 7, 1999, Erica returned home with her brothers from their weekend visitation with her father. Erica went to the basement of her home. Erica helped her aunt, Tara, take down her water bed but soon got bored. She then asked her mother whether she could play with a friend. Erica went to the home of her friend, Sarah, but she was not home. Erica returned home and asked whether she could visit another friend. With permission, Erica left but returned shortly thereafter, saying that this friend also was not home. Erica then asked whether she could take their small dog, Jamie, a Shih Tzu, for a walk. At first, Erica's mother said no because it was raining. After Erica persisted, Melissa relented and allowed Erica to go. Between 3:00 p.m. and 3:15 p.m., Erica and Jamie went out the back door of the house and headed toward the KRC.

{¶ 65} At approximately 3:45 p.m., a couple who had come to the KRC to walk their dog around the pond noticed Erica playing with Jamie by the exercise slant board near the pond. Soon thereafter, they saw Erica leaving the pond area and walking toward the track of Indian Ripple Middle School, which was adjacent to the KRC. A short time later, the couple found Erica's dog, shivering, shaking, and wet, in the doorway of a building at the middle school. They looked briefly for Erica but did not find her.

{¶ 66} When Melissa noticed that it was getting dark, she sent Greg and Logan to look for her at her friends' homes. Melissa testified that Erica would never be out after dark. When they reported that she was not at any of the friends' homes, Melissa went with them to look. When they returned home, Melissa was crying hysterically. Pam Schmidt telephoned the police.

{¶ 67} At approximately 8:10 p.m., Kettering police officer Bill Torok was dispatched to 3340 Pobst Drive on a report of a missing child. A massive search effort was undertaken by the Kettering Police Department. Officers searched the area on bicycles and in patrol cars. Kettering patrol officer Larry Warren, the public information officer, held a press conference, and a report of Erica's disappearance was broadcast on the 11:00 p.m. news. At midnight, the pond at the KRC was being drained. At 1:00 a.m. on February 8, 1999, the area around the KRC was still illuminated, a helicopter was overhead, and officers were continuing to search the area for Erica.

{¶ 68} During the first week after Erica's disappearance, a command post was established at the KRC. A telephone hotline was established, and police officers were assigned to operate the telephones. For the next three months, a command post was located at the shopping center at Woodman Drive and Dorothy Lane. Thereafter, a command post was located at Van Buren Shopping Center. The telephone lines remained active until 2004. Schmidt testified that the recovery center was set up mostly by Greg Baker and his girlfriend, Karen Ginter.

{¶ 69} Melissa Baker and Pam Schmidt both testified that Erica could read and write, knew her address, and knew how to use the telephone. They indicated that they have not heard from Erica since February 7, 1999. They further testified that they did not know Gabriel or Jan Franks, and they did not give Gabriel or Franks permission to be with Erica, alive or dead, or to bury her body.

{¶ 70} Upon review, the state's evidence clearly established that Erica was unlikely to leave home voluntarily and that she did not have the means to do so. At the time of her disappearance, Erica was wearing jeans, a sweatshirt, shoes, and a raincoat. Moreover, despite the extensive search, Erica has not been found. The evidence thus reasonably supports the conclusion that Erica did not injure herself during her walk, in which case she likely would have been located by the officers near the KRC. The fact that she has not contacted her family in any way supports a conclusion that she could not do so. In addition, Erica was fond of her dog and had been seen at the KRC placing the dog in her coat. The fact that the dog was found nearby alone supports the inference that Erica's disappearance was due to a criminal act.

{¶ 71} At oral argument, defense counsel argued that the state's evidence did not necessarily establish that Erica was dead and that it could have equally tended to show that Erica had been abducted. Although we agree that the

possibility exists that Erica was abducted and that she is still alive, we emphasize that the state need not establish Erica's death with proof beyond a reasonable doubt, nor even with proof to establish a prima facie case. Rather, as stated above, the state's evidence merely must "tend to prove" that she has died and, consequently, that there was a corpse.

{¶ 72} In this case, we find significant that Erica was a nine-year-old child who was close to her family, had no independent means of support, and knew how to contact her family but did not. Erica's family was significantly involved in the search for her, limiting the likelihood that she was abducted by a family member or close friend. At the time of trial, Erica had been absent for nearly six years. We note that, for purposes of probate, a presumption of death arises when an individual has been continuously absent from her domicile for five years without being heard from. R.C. 2121.01(A)(1). Although these facts do not eliminate the possibility of abduction or that she may still be alive, in our view, the evidence tended to show that Erica Baker died.

{¶ 73} In light of our conclusion that the state's evidence prior to the admission of Gabriel's confessions supported the conclusion that Erica is dead, the fact that her body has not yet been found further demonstrates that her body was removed from the area and was concealed. "Gross abuse of a corpse can apparently be found in any attempt to conceal a body." *Nobles,* 106 Ohio App.3d at 267, 665 N.E.2d 1137. Under the facts of this case, that evidence satisfies the corpus delicti of both tampering with evidence and gross abuse of a corpse.

{¶ 74} The first assignment of error is overruled.

{¶ 75} IV. "The trial court erred in convicting appellant of tampering with evidence and gross abuse of a corpse as such convictions were not sufficiently supported by the evidence and were against the manifest weight of the evidence."

{¶ 76} In his fourth assignment of error, Gabriel claims that his convictions were based on insufficient evidence and were against the manifest weight of the evidence.

{¶ 77} " '[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, citing Black's Law Dictionary (6th Ed.1990) 1433. When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis* (1997), 79 Ohio St.3d 421, 430, 683 N.E.2d 1096, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560. A guilty verdict will not be disturbed on appeal

unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.

{¶ 78} In contrast, when a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 79} Unquestionably, Gabriel's convictions were based on his confessions to the police. Although Gabriel's statements to the police varied over time, Deputy Wise, Detective Green, and Warden Saunders each testified that Gabriel admitted putting Erica Baker's body into his van, driving her to a park, and burying her. Melissa Baker and Pam Schmidt testified that Gabriel lacked permission to have Erica with him or to bury her. Although the state did not present any forensic evidence linking Gabriel to Erica, Gabriel's admissions were sufficient to support his convictions for tampering with evidence and gross abuse of a corpse, and his convictions were not against the manifest weight of the evidence.

{¶ 80} The fourth assignment of error is overruled.

{¶ 81} V. "The trial court committed prejudicial error by not allowing into evidence testimony regarding Greg Baker's past."

{¶ 82} In his fifth assignment of error, Gabriel claims that the trial court erred when it overruled his request to submit evidence regarding Greg Baker, Erica's father. Prior to opening statements, Gabriel's counsel informed the court that he wished to raise three issues regarding Greg Baker's past, which he argued were relevant to whether Gabriel was responsible for Erica's disappearance.

{¶ 83} First, Gabriel's counsel informed the court that he wished to submit evidence that Greg Baker had molested two children—also family members—

when they were approximately 15 and nine years old. The molestation of one child allegedly occurred in 1986, approximately 13 years before Erica disappeared. The second incident allegedly occurred approximately nine years before Erica disappeared. In response, the state noted that there were no police reports regarding the alleged molestation, that it involved other children, and that it was remote in time from Erica's disappearance. The court concluded that the evidence of the alleged past molestation was not relevant and, even if it were marginally relevant, it would be more prejudicial than probative.

{¶ 84} Second, Gabriel's counsel wished to submit evidence that Erica had had some blood in her underwear a few weeks prior to her disappearance. According to defense counsel, Greg Baker and his then girlfriend, Karen Ginter, had notified Melissa Baker and Pam Schmidt of the blood in Erica's underwear. Schmidt took Erica to the doctor, who performed a visual inspection and obtained a urine sample. The doctor provided medication for a kidney infection and suggested that they see a specialist for a more in-depth examination. Defense counsel indicated that Schmidt considered the blood suspicious in light of the alleged past molestation by Greg Baker. The state noted that the laboratory tests done by the doctor indicated that Erica had had a urinary tract infection. As with the alleged molestation evidence, the court found that the evidence was not relevant and was more prejudicial than probative, and it excluded the evidence.

{¶ 85} Finally, Gabriel's counsel indicated that he wished to submit evidence that Greg Baker's alibi on the day of Erica's disappearance was weak. He indicated that Greg Baker had stated that he had dropped off Erica at her home at 2:45 p.m. At 5:00 p.m., Ginter had called his cell phone to ask where he was and when he was coming home. Greg had indicated that he was doing errands. The trial court did not rule on the admissibility of this evidence.

{¶ 86} As noted by Gabriel, evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Relevant evidence must be excluded under Evid.R. 403(A), however, "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." "Despite the mandatory terms of Evid.R. 403(A), when considering evidence under that rule, the trial court is vested with broad discretion and an appellate court should not interfere absent a clear abuse of that discretion." (Citations omitted.) *State v. Harding*, Montgomery App. No. 20801, 2006-Ohio-481, 2006 WL 267323, at ¶ 21.

{¶ 87} We find no abuse of discretion in the trial court's exclusion of evidence of the alleged molestation and the blood in Erica's underwear prior to her disappearance. In short, we agree with the trial court that the evidence had little, if any, relevance, and the probative value of that evidence was substantially

outweighed by the danger of unfair prejudice to the state, of confusion of the issues, and of misleading the jury.

{¶ 88} As to the evidence of Greg Baker's activities on the day of Erica's disappearance, the record does not support Gabriel's conclusion that the trial court excluded that evidence. The fifth assignment of error is overruled.

{¶ 89} III. "The trial court committed plain error and violated defendant-appellant's rights when it failed to recognize the offenses for which he was indicted and sentenced constituted allied offenses of similar import."

{¶ 90} In his third assignment of error, Gabriel claims that tampering with evidence and gross abuse of a corpse are allied offenses of similar import and, therefore, he could not be convicted of both crimes, pursuant to the Double Jeopardy Clause.

{¶ 91} "R.C. § 2941.25, Ohio's allied offense statute, protects against multiple punishments for the same criminal conduct, which could violate the Double Jeopardy Clauses of the United States and Ohio constitutions. It provides as follows:

{¶ 92} " '(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶ 93} " '(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where this conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted for all of them.'

{¶ 94} "The Supreme Court of Ohio held that the elements of alleged allied offenses are to be compared in the abstract. *State v. Rance* (1999), 85 Ohio St.3d 632, 710 N.E.2d 699, ¶ 1 of the syllabus. In *Rance*, supra, the Supreme Court set out a two-part test to determine when convictions may be obtained for two or more allied offenses of similar import. In the first step, the elements of the offenses at issue are compared in the abstract to determine whether the elements correspond to such a degree that the commission of one offense will result in the commission of the other. Id. at 638 [710 N.E.2d 699]. However, if a defendant commits offenses of similar import separately or with a separate animus, he may be punished for both of them pursuant to R.C. § 2941.25(B). Id., *State v. Jones* (1997), 78 Ohio St.3d 12, 13–14, 676 N.E.2d 80." *State v. Coffey*, Miami App. No. 2006–CA–6, 2007-Ohio-21, 2007 WL 29424, at ¶ 15–18. Gross abuse of a corpse is defined as follows: "No person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities." R.C. 2927.01(B).

{¶ 95} R.C. 2921.12, which defines tampering with evidence, provides: "(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following: (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." R.C. 2921.12(A)(1).

{¶ 96} Clearly, tampering with evidence can be committed without committing gross abuse of a corpse. Simply put, R.C. 2921.12(A)(1) is not limited to tampering with corpses. Likewise, a person may commit gross abuse of a corpse without simultaneously committing tampering with evidence. See *State v. Condon*, 152 Ohio App.3d 629, 2003-Ohio-2335, 789 N.E.2d 696 (affirming convictions for gross abuse of a corpse when the defendant, without permission, used corpses as models—some with props—for his photographic art while they awaited retrieval from the county morgue); *State v. Gardner* (1989), 65 Ohio App.3d 24, 582 N.E.2d 1014 (affirming conviction for gross abuse of a corpse based on the defendant's sexual contact with a corpse at a funeral home).

{¶ 97} Because each of the offenses of which Gabriel was convicted can be committed without necessarily committing the other, they are not allied offenses of similar import, and the Double Jeopardy clauses of the Ohio and United States constitutions are not implicated.

{¶ 98} Gabriel's third assignment of error is overruled.

{¶ 99} VI. "The trial court's sentencing of appellant must be vacated as the factors and portions of the sentencing statutes cited by the trial court during sentencing have been found to be unconstitutional by the Ohio Supreme Court."

{¶ 100} In his sixth assignment of error, Gabriel claims that the trial court's sentence was unconstitutional, pursuant to *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. We agree. Because *Foster* held the statutes under which Gabriel's sentence was imposed to be unconstitutional and severed them from the sentencing provisions of the Revised Code, we must reverse the sentence and remand this case for a new sentencing hearing. Id. at ¶ 104–105.

{¶ 101} Gabriel's sixth assignment of error is sustained.

{¶ 102} The sentence will be reversed, and the matter will be remanded for resentencing. In all other respects, the judgment will be affirmed.

Judgment affirmed in part
and reversed in part,
and cause remanded.

BROGAN, J., concurs.

DONOVAN, J., concurs in part and dissents in part.

DONOVAN, Judge, concurring in part and dissenting in part.

{¶ 103} I agree with the majority's resolution of six of seven assigned errors. However, I disagree with the majority's resolution of the first assignment of error.

{¶ 104} I would conclude that the State of Ohio failed to establish the corpus delecti of both gross abuse of a corpse and tampering with evidence. The majority correctly cites *State v. Van Hook* (1988), 39 Ohio St.3d 256, 530 N.E.2d 883, for the proposition that the corpus delecti rule does not require evidence related to all elements of the crime(s) charged. However, the rule does require independent evidence, albeit minimal, of *some material element* of the crime(s) charged.

{¶ 105} To support its theory that the disappearance of Erica Baker, without any independent evidence, is sufficient to satisfy the corpus delicti rule, the state of Ohio relies on three wholly distinguishable cases in its brief. In *State v. Black* (1978), 54 Ohio St.2d 304, 8 O.O.3d 296, 376 N.E.2d 948, the victim was discovered without her purse and shopping bag, which she had been observed carrying when she left work just prior to being shot. This evidence, both direct and circumstantial, was deemed sufficient to admit the defendant's confession to aggravated robbery. The defendant's confession in *State v. Newberry* (Dec. 18, 1987), Montgomery App. No. 10353, 1987 WL 29572, to car theft was admitted after the prosecution presented evidence that the victim's motor vehicle had, in fact, been moved from its usual parking spot. Last, in *State v. McCormick*, Montgomery App. No. 19505, 2003-Ohio-5330, 2003 WL 22287847, the defendant, a state trooper, confessed to wiping down the firearm he had used to shoot his wife. The confession was admitted after the state presented evidence about defendant's unusual conduct on the day of the shooting, as well as the odd fact that he wore only one sock to work on the day he was arrested. This evidence allowed for the inference that the defendant had removed one of his socks in order to wipe down the gun.

{¶ 106} In all of the above cases, independent evidence existed that corroborated some material element of the charged offenses, thus satisfying the corpus delicti rule. In the instant case, no such evidence has been presented that even tenuously demonstrates that Gabriel tampered with evidence or abused Erica's corpse.

{¶ 107} The fact that Erica is missing, standing alone, is insufficient to indicate death. Absent any direct or circumstantial evidence of a human corpse or its abuse or concealment, there is no evidence outside of appellant's confession that Erica is, in fact, dead, or that her body has been mistreated and/or concealed. There is neither evidence of "an act" nor a "criminal agency." The majority concludes that the circumstances of her disappearance "tend" to show that Erica

Baker is dead rather than abducted and still alive. However, evidence equally consistent with two hypotheses "tends" to prove neither.

{¶ 108} While the state of Ohio may rely on a combination of direct and circumstantial evidence, or circumstantial evidence alone to establish guilt, "in a criminal prosecution the corpus delecti may be established by circumstantial evidence when the inference of the happening of the criminal act complained of is the *only* probable or natural explanation of the proven facts and circumstances." (Emphasis added.) *State v. Nevius* (1947), 147 Ohio St. 263, 34 O.O.210, 71 N.E.2d 258, paragraph five of the syllabus.

{¶ 109} The flaw in the majority's reasoning is that the independent evidence, to wit, Erica's disappearance, standing alone, is ambiguous, and the ambiguity is resolved only by appellant's statements. As noted in *Edwards,* Ohio has clearly retained the rule that the corpus delecti of the charges must be established prior to the admission of Gabriel's statements. Ohio has not yet adopted the federal rule, which requires only a showing of "trustworthiness" of a confession or independent evidence that merely "tends" to corroborate.

{¶ 110} Further, any reference to R.C. 2121.01(A)(1), a probate statute addressing a presumption of death after five years, has no place in a criminal prosecution. In the law, there is a general presumption of the continuation of life. See 30 Ohio Jurisprudence 3d (1981), Presumption as to Continuance of Life, Section 3. R.C. 2101.01(A)(1) merely replaces the presumption of life with a presumption of death in certain circumstances for civil proceedings, such as distribution of estate assets and life insurance.

{¶ 111} There is simply no evidence in the record before us, outside of Gabriel's confession, that establishes the corpus delecti of either indicted charge. The Ohio Supreme Court in *Edwards* and *State v. Black* (1978), 54 Ohio St.2d 304, 8 O.O.3d 296, 376 N.E.2d 948, reaffirmed the principle that the confession is not admissible until after establishment of the corpus delecti. I would sustain the first assignment of error and reverse, finding that the evidence of corpus delecti is deficient.