[Cite as *State v. Harris*, 2024-Ohio-99.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29780 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 01539 |
| | : | |
| DERRICK HARRIS | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 12, 2024

. . . . . . . . . . .

MICHAEL MILLS, Attorney for Appellant

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

. . . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Defendant-Appellant Derrick Harris appeals from his conviction for trafficking in cocaine following a jury trial. For the reasons set forth below, we affirm the judgment of the trial court.

I.     **Factual and Procedural Background**

{¶ 2} On or around February 10, 2022, Sonya Green and Willie Casey, Derrick

Harris's niece and nephew, visited Ohio from Tennessee for a funeral and stayed with Harris at his residence in Harrison Township, Montgomery County, Ohio. Following the funeral, Green returned to her home in Tennessee while Casey stayed in Ohio with Harris. Before leaving, though, Green had asked Harris not to sell any drugs to Casey, who had a history of drug use. Harris promised that he would not.

{¶ 3} On the morning of February 18, 2022, Green spoke to Casey on the telephone and became concerned when Casey told her that he had been sleeping a great deal. Green then contacted Harris to express her concern about Casey's well-being. Later that day, at approximately 8:00 p.m., Green spoke to Harris again; Harris told Green that Casey was unconscious at the time and attempts were being made to revive him. Green told Harris to call 911.

{¶ 4} Shortly thereafter, the Dayton Police Department received an emergency call for a drug overdose. Officers Joshua Erwin and Zachary Newsome were dispatched to the scene and found Casey unconscious in Harris's residence. Harris told Officer Erwin that he believed Casey had taken marijuana, suboxone, and oxycodone. Despite efforts by first responders to revive him, Casey was later pronounced dead at the scene.

{¶ 5} Casey underwent an autopsy, and a sample of his blood was sent to the Miami Valley Regional Crime Lab for toxicology analysis. Heather Antonides, a forensic toxicologist, performed a presumptive screen of Casey's blood sample, which was positive for drugs of abuse, including cocaine, benzodiazepine, marijuana, and fentanyl. According to Antonides, Casey likely consumed cocaine four to eight hours before his death.

{¶ 6} After Casey's death, Harris and Green exchanged text messages in which Harris told Green that he knew that he had promised not to sell Casey drugs, but when Casey offered him $500, he went back on his word. Harris asked Green to not tell Casey's daughter about his drug sale to Casey. Harris also corrected Green when she suggested that he sold heroin to Casey, saying that he actually sold crack to Casey, not heroin, and that he had expected Casey to take the drugs back to Tennessee to sell them rather than to use them.

{¶ 7} Also, following Casey's death, Officer Christopher Savage, a detective in the narcotics bureau, was assigned to investigate Casey's fatal overdose. Green contacted Officer Savage and informed him that she had received text messages from Harris following Casey's death which confirmed that Harris had supplied the drugs to Casey.

{¶ 8} Thereafter, Officer Savage and Officer Mark Orick talked with Harris at a family member's home in Dayton. When they arrived, Officers Savage and Orick were wearing their badges, Dayton Police Department vests, and concealed firearms, and Officer Orick was wearing a body camera. Upon their arrival, they knocked, and a female answered the door. She invited the officers in and called for Harris, who was in the back room. When Harris came out, he spoke freely to Officers Savage and Orick and did not appear intoxicated.

{¶ 9} Officers Savage and Orick explained to Harris that they were there to talk about the report to police that Harris had made on the evening Casey died. Once they started talking and Harris voluntarily told them about the events of that evening, Officer Savage decided to verbally inform Harris of his *Miranda* rights, because his account of

the events did not align with other information that Officer Savage had been given. After he was read his *Miranda* rights, Harris continued to provide statements and did not indicate that he no longer wanted to speak to the officers or that he wanted to speak to an attorney. Officers Savage and Orick never made any promises to Harris in exchange for information; they also did not handcuff or threaten Harris. Officer Savage told Harris that they were not trying to put a drug charge on him.

{¶ 10} During the interview, Harris provided numerous versions of what had occurred on the night of Casey's death. Initially, Harris denied giving or selling cocaine to Casey and denied knowing where Casey had obtained the drugs. Harris claimed he had believed that Casey was just sleeping on the day that he died. Harris originally claimed that his text messages to Green were just to "shut her up" because she would not leave him alone. Later, however, Harris changed his story, saying that he made several calls and that someone else sold the drugs to Casey. Harris also said that he did not want to provide the seller's name because then he would be a snitch. Later still, Harris said that he had purchased cocaine from "George" to give to Casey and then said that he had bought crack for Casey. Harris said that Casey gave him $225, which was enough for a quarter of an ounce of crack, or approximately seven grams, and then Harris gave the crack to Casey. Harris denied giving Casey heroin but claimed that "Mike" had provided heroin to Casey. After the interview concluded, Officers Savage and Orick left the residence, and Harris was not arrested.

{¶ 11} On June 27, 2022, Harris was indicted for one count of trafficking in cocaine (equal or more than 20 grams but less than 27 grams) in violation of R.C. 2925.03(A)(1),

a felony of the second degree. On August 1, 2022, Harris filed a motion to suppress the statements he had made. A hearing on the motion to suppress was held on October 17, 2022, and the trial court overruled the motion on October 21, 2022.

{¶ 12} A jury trial was held on March 21, 2023. The jury found Harris guilty of trafficking cocaine in an amount less than five grams, making the offense a felony of the fifth degree. On May 2, 2023, Harris was sentenced to seven months in prison. Harris timely appealed.

## II.      Assignments of Error

{¶ 13} Harris asserts the following two assignments of error:

THE STATE OF OHIO FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION FOR R.C. 2925.03 AND THE APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND THE SIXTH AND FOURTEENTH AMENDMENTS.

{¶ 14} In *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), the Supreme Court of Ohio clarified the distinction between appellate review of the sufficiency of the evidence and appellate review of the weight of the evidence.  A sufficiency of the evidence argument relates to whether the State "presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10,

citing *Thompkins.* "In essence, sufficiency is a test of adequacy. Whether the evidence is sufficient to sustain a verdict is a question of law." *Thompkins* at 386.

{¶ 15} The test for sufficiency of the evidence was set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Wilson* at ¶ 11. In other words, on review for sufficiency, courts are to assess not whether the State's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. *Thompkins* at 390.

{¶ 16} A weight of the evidence argument, on the other hand, challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *Wilson* at ¶ 12, citing *State v. Hufnagel*, 2d Dist. Montgomery No. 15563, 1996 WL 501470, *3 (Sept. 6, 1996). The proper test to apply to a manifest weight of the evidence inquiry is set forth in *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983), which states:

> [T]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and

determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*Wilson* at ¶ 13. "In order to find that a manifest miscarriage of justice occurred, an appellate court must conclude that a guilty verdict is 'against,' that is, contrary to, the manifest weight of the evidence presented." *Id.* at ¶ 14, citing *see State v. McDaniel,* 2d. Dist. Montgomery No. 16221, 1998 WL 214606 (May 1, 1998).

{¶ 17} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Flores-Lopez*, 2d Dist. Montgomery No. 27108, 2017-Ohio-690, ¶ 49, citing *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11; *accord State v. Robinson*, 2d Dist. Montgomery No. 26441, 2015-Ohio-1167, ¶ 17. As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Robinson* at ¶ 17, citing *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 18} We begin our discussion with Harris's first assignment of error.

{¶ 19} Harris was charged with violating R.C. 2925.03(A)(1), which states that "[n]o person shall do any of the following: (1) Sell or offer to sell a controlled substance or a controlled substance analog * * *." With respect to his first assignment of error, Harris initially argues that the evidence was not sufficient to demonstrate that some part of the offense with which he was charged was committed in Montgomery County, thereby

establishing venue. Specifically, Harris argues that, despite Antonides's testimony that Casey likely consumed cocaine four to eight hours before his death, she did not establish a correlation or nexus between the cocaine present in Casey's blood and Harris as the potential source of the cocaine. Harris argues that none of his admissions during his interaction with Officer Savage provided evidence of where an exchange of drugs and money occurred nor was there any physical evidence of a drug transaction offered at trial. Harris generally argues that the presence of an illicit substance in Casey's system at the time of his death did not establish that a sale of an illicit drug took place in Montgomery County. Under the circumstances of this case, we disagree.

{¶ 20} "The elements of the offense charged and the venue of the matter are separate and distinct." *State v. Draggo*, 65 Ohio St.2d 88, 90, 418 N.E.2d 1343 (1981), citing *State v. Loucks*, 28 Ohio App.2d 77, 274 N.E.2d 773 (4th Dist.1971) and *Carbo v. United States*, 314 F.2d 718 (9th Cir.1963). "Venue is not a material element of any offense charged." *Id.* However, in all criminal prosecutions, "venue is a fact that must be proved at trial unless waived." *Id.*, citing *State v. Nevius*, 147 Ohio St. 263, 71 N.E.2d 258 (1947).

{¶ 21} Venue does not need to be proved in express terms "so long as it is established by all the facts and circumstances in the case." *State v. Headley*, 6 Ohio St.3d 475, 477, 453 N.E.2d 716 (1983), citing *State v. Dickerson*, 77 Ohio St. 34, 82 N.E. 969 (1907), paragraph one of the syllabus. Section 10, Article I of the Ohio Constitution describes venue, or the proper place to try a criminal matter, as follows: " * * * In any trial, in any court, the party accused shall be allowed * * * a speedy public trial by an impartial

jury of the county in which the offense is alleged to have been committed * * *." Accordingly, the rule for venue "is that the place of trial is to be where the offense occurred." *Headley* at 477. This rule for venue is codified in R.C. 2901.12, which states, in part, that an offender may be tried in any jurisdiction where it appears beyond a reasonable doubt that the offense or any element of the offense was committed in that jurisdiction. R.C. 2901.12(G).

{¶ 22} "The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts primarily to resolve." *Wilson,* 2d Dist. Montgomery No. 22581, 2009-Ohio-525, at ¶ 15, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). In *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997), 2d Dist. Montgomery No. 16288, we explained:

> "Because the factfinder * * *, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness."

*Id.* at *4. Thus, we will not substitute our judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict. *See Wilson* at ¶ 17, citing *State v. Bradley,* 2d Dist. Champaign No. 1997-CA-3, 1997 WL 691510, *4 (Oct. 24, 1997).

{¶ 23} In this case, Green testified at trial that she had been in Ohio with Casey until she returned home to Tennessee on February 13, 2022. Green also testified that she received a call from Casey on the morning of February 18, 2022, before he died at Harris's Montgomery County residence later that day. Green testified that Casey's call that morning concerned her and that she then contacted Harris to express her concerns regarding Casey. Green did not speak to Harris again until later that evening when she called him, at which time he indicated that efforts were being made to revive Casey, who was unconscious.

{¶ 24} Thereafter, Harris called Green to inform her that Casey had died. Green testified that she had asked Harris not to provide any drugs to Casey, who had a history of drug use, and Harris had assured Green that he would not. After Casey died, Green confronted Harris by text message about her prior request that he not sell Casey any drugs. Harris texted Green that he had not planned to sell any drugs to Casey, but that Casey had offered him $500, causing Harris to go back on his word, which he regretted. Green also testified that Harris said to her that the police should not be contacted, as he would be in trouble. Green's testimony established that Casey was in Dayton at Harris's house in Montgomery County throughout the day on February 18, 2022, when he died.

{¶ 25} Antonides testified at trial that she analyzed Casey's blood taken during his autopsy at the coroner's officer and found that Casey had cocaine, benzodiazepine, marijuana, and fentanyl in his system at the time of his death. Antonides also testified that cocaine can be detected in an average person's system for approximately four to eight hours after ingestion.

{¶ 26} Officer Savage testified at trial that, during his interview with Harris, Harris had changed his story several times, saying that: he made some calls for others to bring drugs to his residence for Casey; it was someone else who sold the drugs to Casey; and he did not want to provide the seller's name because then he would be a snitch. Later, Harris said that he had purchased cocaine from "George" to give to Casey and then he said that he bought crack for Casey. Harris said that Casey gave him $225, which he used to buy crack, and that he gave the crack to Casey. Harris denied giving Casey heroin but claimed that "Mike" provided heroin to Casey. Harris also told Officer Savage that he had recently been released from the hospital and that he was on bed rest resulting from the hospitalization.

{¶ 27} Green's undisputed testimony established that Casey was staying at Harris's residence in Montgomery County and died of a fatal overdose there. While Harris never specifically stated that a drug sale occurred at his residence, Harris implied that the transaction occurred there when he told Officer Savage that he made calls to drug sellers and bought crack to give to Casey and that Casey gave him $225 for a quarter ounce. Finally, Antonides provided testimony that Casey likely ingested the cocaine at some point during the day on February 18, 2022, approximately four to eight hours before he died of an overdose. Under these circumstances, we conclude that it was reasonable and supported by sufficient evidence for the jury to find that some part of the drug trafficking offense took place within Montgomery County, and, thus, venue in Montgomery County was proper.

{¶ 28} Harris next argues that the trial court erred by allowing the State to offer

evidence of the presence of cocaine in Casey's body as proof of a crime. In other words, according to Harris, the jury did not hear any evidence linking the cocaine in Casey's blood at the time of his death to any specific sale involving Harris, nor did the jury hear evidence allowing them to conclude that Casey either received or was sold the drugs in his system during the specified dates of Harris's indictment from February 15 to February 18, 2022. Harris argues that the jury improperly convicted him of trafficking based on the evidence submitted at trial. We disagree.

{¶ 29} It is undisputed that Casey had cocaine and other drugs in his system and died from a drug overdose on February 18, 2022. Harris was not charged in association with Casey's death, but the circumstances surrounding Casey's death directly related to the charge for which Harris was indicted. Again, Green testified that she spoke to Casey on the day of his overdose death and was concerned about his well-being. After Casey's death, Green confronted Harris by text message about Harris giving drugs to Casey, and Harris apologized for breaking his promise to Green. During the text conversation, Harris also corrected Green that it was not heroin that was sold to Casey but, rather, it was crack. Additionally, Officer Savage testified that, during his interview with Harris, Harris initially denied giving Casey any drugs but later claimed that the drugs had been purchased from someone else to give to Casey and that Harris had admitted selling Casey the crack. Finally, Antonides testified that Casey had drugs in his system, including cocaine, at the time of his death. While Harris argued that any of the other drugs in Casey's system could have caused his overdose, Antonides testified that he likely consumed the cocaine four to eight hours before he died.

{¶ 30} Under these circumstances, we conclude that it was reasonable for a jury to find Harris guilty of trafficking in cocaine. Harris admitted to selling cocaine to Casey in the text messages to Green after Casey offered him $500. Green testified as to the content of those text messages, which were also shown to the jury as exhibits. The jury was allowed to determine the credibility of Green's testimony and of those text messages. The jury was also permitted to assess the credibility of Antonides's testimony concerning the toxicology findings that Casey had cocaine and other drugs in his system at the time of his overdose death and that he likely consumed the cocaine four to eight hours before his death. Finally, the jury was in the best position to assess the credibility of Officer Savage's testimony concerning how Harris made calls and admitted to arranging for the delivery of crack and to giving Casey the crack after Casey offered him money, but it also had an opportunity to view portions of Savage's interview with Harris and consider the statements Harris made during that interview. This evidence was sufficient to establish the elements of the trafficking of cocaine offense for which Harris was convicted.

{¶ 31} After reviewing the entire record and weighing the evidence presented by the State and all reasonable inferences, and considering the credibility of the witnesses, we conclude the jury did not lose its way or create a manifest miscarriage of justice in connection with Harris's conviction for drug trafficking. Based on the testimony of Officer Savage, Green, and Antonides, the jury could have reasonably inferred that Harris had sold or offered to sell cocaine to Casey in violation of R.C. 2925.03(A)(1).

{¶ 32} Because we conclude that there was sufficient evidence in the record to support venue and Harris's trafficking in cocaine conviction, and because Harris's

conviction was not against the manifest weight of the evidence, Harris's first assignment of error is overruled.

{¶ 33} Harris's argument in his second assignment of error is somewhat unclear as to its scope, although he argues that his trial counsel was ineffective for failing to object to the testimony of the toxicologist or the blood evidence and that, if an objection had been made, the outcome of the trial would have been altered. He also appears to suggest that his counsel was ineffective for failing to preserve an objection related to corpus delicti.

{¶ 34} To prevail on an ineffective assistance of counsel claim, a defendant must prove that his attorney was ineffective under the standard test from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The test has two parts. First, the defendant must show that counsel's performance was deficient. *Id.* at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Id.*

{¶ 35} As to the first prong, much deference is given to trial counsel. "[A] court must indulge in a strong presumption that the challenged action might be considered sound trial strategy. Thus, judicial scrutiny of counsel's performance must be highly deferential." *State v. Bird*, 81 Ohio St.3d 582, 585, 692 N.E.2d 1013 (1998).

{¶ 36} If the first prong is met, then "prejudice" may be considered. To demonstrate prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v.*

*Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1998), first paragraph of the syllabus. Speculation does not prove either prong under *Strickland*. *State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, 103 N.E.3d 784, ¶ 53 ("speculation cannot prove prejudice"); *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 91 N.E.2d 865, ¶ 86 (speculative argument cannot be a basis for finding deficient performance under an ineffective assistance of counsel claim).

{¶ 37} "A debatable decision involving trial tactics generally does not constitute a deprivation of effective counsel." *State v. Russell*, 2d Dist. Montgomery No. 21458, 2007-Ohio-137, ¶ 50. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time." *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992).

{¶ 38} Related to Harris's ineffective assistance of counsel argument, we will first consider the corpus delicti rule. "The corpus delicti of a crime is essentially the fact of the crime itself." *State v. Ashe*, 2d Dist. Montgomery No. 26528, 2016-Ohio-136, ¶ 9, quoting *State v. Barker,* 10th Dist. Franklin No. 03AP-43, 2003-Ohio-5346, ¶ 4. The corpus delicti rule is an evidentiary rule in which the State must provide evidence tending to establish the act and the criminal agency of that act. *Barker* at ¶ 12. However, the threshold imposed by the corpus delicti rule is low. *Ashe* at ¶ 9, citing *State v. Gabriel,* 170 Ohio App.3d 393, 2007-Ohio-794, 867 N.E.2d 474, ¶ 58 (2d Dist.), *reversed on other grounds, In re Criminal Sentencing Cases,* 116 Ohio St.3d 31, 2007-Ohio-5551, 876 N.E.2d 528. The evidence does not have to "equal proof beyond a reasonable doubt nor even make a prima facie case" and may also be circumstantial. *Id.*, quoting *State v. Black,* 54 Ohio

St.2d 304, 308, 376 N.E.2d 948 (1978); *Gabriel* at ¶ 58. The corpus delicti rule also does not require evidence showing that the accused committed the crime but, rather, only requires some evidence that a crime was, in fact, committed. *Id.*, citing *State v. Hopfer,* 112 Ohio App.3d 521, 561, 679 N.E .2d 321 (2d Dist. 1996).

{¶ 39} In this case, Casey died of a drug overdose and had several drugs in his system, including cocaine, at the time of his death. The threshold imposed by the corpus delicti rule is low and did not require evidence showing that Harris committed the crime but only some evidence that a crime was committed. Under these circumstances, we conclude that, because evidence concerning Casey's drug overdose and toxicology report was sufficient to indicate that a crime had been committed, namely the sale of cocaine, the evidence was sufficient to satisfy the corpus delicti rule. Harris has failed to establish that his counsel was ineffective in failing to preserve this issue for appeal, as he has failed to demonstrate that his counsel's performance was deficient or that he was prejudiced by his counsel's action.

{¶ 40} As to Harris's claim that his counsel was ineffective for failing to object to the testimony of the toxicologist regarding the drugs in Casey's system at the time of his death, it was reasonable that Harris's trial counsel would have wanted the toxicologist's testimony as part of his trial strategy, as it was undisputed that Casey died of an overdose. At issue was whether Harris sold Casey the drugs that killed him. Antonides testified that Casey had several drugs, including cocaine, in his system at the time of this death. She also testified that these substances remained in a person's blood for various lengths of time, with cocaine remaining for approximately four to eight hours, and that it was

impossible to know exactly what drug caused the overdose or precisely when the cocaine entered Casey's system.

{¶ 41} Allowing the testimony and cross-examination of Antonides concerning her ability to determine what substances were in Casey's system and when he may have ingested them was a reasonable trial strategy. By conceding that drugs were the cause of death, Harris's trial counsel was able to point out that several substances were present in Casey's system and that the time of ingestion was unknown. In doing so, counsel attempted to cast doubt regarding the time and place of the sale and ingestion of cocaine and, thus, on the State's argument that Harris had sold the cocaine to Casey. Under the circumstances before us, we cannot say that Harris's trial counsel was ineffective. Moreover, Harris's assertion that the outcome of his trial would have been different had his trial counsel objected to the blood evidence and Antonides's testimony is purely speculative.

{¶ 42} Although Harris's trial counsel was unsuccessful in convincing the jury, that alone does not support an ineffective assistance of counsel claim. Harris has not demonstrated that his trial counsel's performance was deficient or that there exists a reasonable probability that Harris was prejudiced in any way by the performance.

{¶ 43} Harris's second assignment of error is overruled.

### III.    Conclusion

{¶ 44} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and EPLEY, J., concur.